**KING v. KING'S UNKNOWN HEIRS.**
(No. 8146.)

Court of Civil Appeals of Texas. San Antonio.
March 6, 1929.

Rehearing Denied April 17, 1929.

Winfree & Weslow, of Houston, for appellant.

Midkiff & Green, of Gonzales, for appellees.

SMITH, J. William King, as plaintiff below, brought this action in the county court of Gonzales county against the admitted collateral heirs of Guy H. King, deceased, asserting title to the property of the estate of the decedent upon the ground that the plaintiff was the product of a common-law marriage between said decedent and Paula Sosa, deceased. From an adverse judgment in the county court, King appealed to the district court, where the cause was submitted to a jury upon the issue of common-law marriage, which the jury resolved against King, who has appealed.

■ The first and second assignments of error are that "the verdict of the jury is contrary to the evidence" and that "the judgment of the court is contrary to the law." These assignments are in direct conflict with rules 25 and 26 of the Courts of Civil Appeals, and are therefore too general to entitle them to consideration. Nevertheless we have very carefully considered appellant's contentions under both of said assignments and the propositions thereunder, and conclude that they should all be overruled upon their merits.

■■ Appellant's claim rests upon his contention that Guy King and Paula Rubio Sosa, a widow with one child of a former marriage, established the relation of husband and wife in 1894, and continued the relation for approximately 30 years and up to the time of King's death. It is undisputed, and it affirmatively appears, that King resided and maintained his bachelor home in the town of Gonzales throughout that whole period, just as he had always done theretofore. According to appellant's witnesses, the parties began their illicit relations in the town of Gonzales, soon after the woman came there. At no time did they live together in the same house, but King continued to reside alone, or rather with his men employés, in his own home. It is in evidence that he procured the renting and furnishing of a house at his own expense, and that she moved into it with her young daughter, and lived there during the period of her residence in Gonzales. But King did not in person rent the house, or furnish it, or move the woman into it, as a man would naturally do for his acknowledged wife. On the other hand, he clothed the transaction in the utmost secrecy, carefully concealing from the public his interest in and relation to the matter; he invoked the aid of one of his Mexican employés, whom he bound to secrecy, and privately supplying the funds to him, procured him to rent the house and furnish it, in the employés name. His whole conduct was therefore in direct and positive repudiation of every semblance of the marital state.

With the stage thus secretly set, the couple began their secret and illicit relations, but King continued residing in his own home, and maintained all the outward appearances of bachelorhood throughout the period of Paula's residence in Gonzales. Some time later, apparently several years, Paula moved to San Antonio, and took up her residence in a three-room dwelling house on Matamoros street, with her daughter and her son, William, conceded to be the product of her relation with King. It is obvious, then, that up to this time not a circumstance had transpired to support the claim of common-law marriage, except cohabitation. King did not follow or take up his residence with Paula Sosa in San Antonio. On the contrary, he continued, as always before, to reside in his Gonzales home. He was, throughout his adult life, a trader in live stock, and his business brought him frequently from his home in Gonzales to the stockyards in San Antonio. And so, when Paula moved to the city, King, instead of stopping elsewhere as in his previous visits, stayed with her in her home on the occasions of his business trips to San Antonio. There is no evidence that he made his home with her in any ordinary or proper sense of the term home, or that he ever visited her, except when in San Antonio in the prosecution of his horse-trading business, or that he went to San Antonio oftener, or made longer visits, after she moved there than before. He continued during the remainder of his life, as always before, to maintain and reside in his home at Gonzales, in obvious bachelorhood. Thus the most important element of the true marital state, that of a common homestead, is clearly excluded from the case.

So is there also lacking the essential element of either or both parties holding out to the public their relation of husband and wife. There is no evidence of the couple ever being seen together in public, or that together they ever attended a single religious, business, social, or other function or gathering of any nature, or were seen together outside of her house, during the 30 years of their alleged coverture. Of all the 23 witnesses who testified in the case, only 4 or 5 undertook to testify to any fact or circumstance which could be construed into a recognition or an assertion by either party of any marriage relation between them. These few witnesses related only remote and isolated incidents or expressions tending to support appellant's claim. Most, if not all, of such testimony was discredited by the witnesses themselves, some of whose testimony upon the last trial was in direct conflict with their testimony in a former trial, and some of whom admitted that an interest in whatever appellant might recover had been transferred to them, although they were strangers to the litigation, and had no sort of relation to the rights as-

serted by appellant in this suit. It was also disclosed in the trial that one Duncan, also a complete stranger to appellant's asserted rights, and who was neither a party to nor witness in the case, and had no connection with the litigation, except to busy himself in getting up testimony for appellant, had an assignment of a half interest in whatever appellant might recover in the suit. The inconsistencies and conflicts in the testimony of those witnesses, and their strangely acquired interest in the recovery, warranted the jury in disbelieving their testimony in toto, and, if necessary to support the verdict and judgment, it will be presumed that the jury did disregard that testimony. We have not discussed the testimony for appellees, which clearly refuted appellant's claim, and which the jury evidently credited. We have stated the case as made by appellant's own witnesses.

■■ Appellant relies upon and quotes at length from the opinion of Chief Justice Gaines in the case of Nixon v. Cattle Co., 84 Tex. 408, 19 S. W. 560, in support of the contention that doubts and presumptions should be resolved in favor of those asserting a common-law marriage. The case cited is not in point, for the decision and opinion therein do not involve a common-law marriage, but one entered into through a public ceremony performed by a duly authorized official, under a license regularly issued by the proper authority. The question there was whether that ceremony was performed before or after one of the parties had been legally released from a former marriage, and it was quite reasonably and properly held that it was the duty of the courts to indulge all reasonable presumptions in favor of the validity of a marriage entered into under the forms and ceremonies prescribed by statute. We know of no principle or pronouncement under which the courts of Texas are required or authorized to resort to or indulge in presumptions, or liberal construction of law or application of facts, in order to legalize illicit relations between men and women. On the other hand, the rule is, and ought to be, in support of decency and good morals, that clear and satisfactory proof be required to establish a common-law marriage; proof that the intent of the parties—to raise such relation from the status of mere clandestine intercourse to the holy status of lawful wedlock—has been manifested by all the elements of statutory marriage, except the license and public ceremony.

The case made here presents none of the decent elements of marriage, of home, of normal family life. Conceding as true all the evidence produced by appellant, it presents but a bald and sordid life of lewdness, attended by none of the characteristics of lawful wedlock except cohabitation. It does not matter whether marriage is, technically, a "status" or a "contract," or whether it be solemnized in the manner and form prescribed by statute, or simply by mutual agreement, it does and should mean the same thing to the parties, and must be evidenced to the public by the same conduct and mode and manner of living; the only difference being the absence, in case of mutual consent, of license and public ceremony. Grigsby v. Reib, 105 Tex. 597, 153 S. W. 1124, L. R. A. 1915E, 1, Ann. Cas. 1915C, 1011; James v. James (Tex. Civ. App.) 253 S. W. 1112, writ of error denied. As was said by Chief Justice Brown in the opinion in the Grigsby Case (italics ours):

"Marriage is not a contract, but a status created by mutual consent of one man and one woman. The method by which it is solemnized, or entered into, may be by proceedings prescribed by statute, or by mutual agreement with cohabitation, but, *however contracted, having the same elements and producing the status of husband and wife. The sole difference which can legally exist is in the method of expressing consent, and the only particular in which a marriage as at common law can differ from the statutory method is the absence of license and the ceremony. The cohabitation must be professedly as husband and wife, and public, so that by their conduct towards each other they may be known as husband and wife.* Such marriages may be equally the consummation of a mutual affection, which will produce a home and family that will contribute to good society, to free and just government, and to the support of Christianity —to the common weal. It would be sacrilegious to apply the designation, 'a civil contract,' to such a marriage. It is that and more; a status ordained by God, the foundation and support of good government, and absolutely necessary to the purity and preservation of good society. When the 'wedding day' of the parent ceases to be revered by the offspring there will be a weakening of the family ties and a lowering of the standard of marriage and home."

The case presented here comes clearly under the condemnation of that opinion, and meets none of the tests there so well laid down. The jury could not have properly arrived at any other verdict than that rendered upon the issue of common-law marriage. The first assignment of error and propositions thereunder are therefore overruled upon the merits.

The second assignment and proposition thereunder are based upon the assumption that the jury finding shall be reversed and rendered. As that finding must stand, the second assignment has no basis, and, if considered, must be overruled.

■ In appellant's third assignment of error complaint is made of the exclusion of the proffered testimony of one B. W. Whisenant, a witness for appellant, concerning statements made to the witness by Guy H. King,

the decedent, whose estate is in controversy in this suit. This assignment is based upon appellant's first bill of exception, in which it is recited, merely, that appellant "offered to prove by B. W. Whisenant statements made by Guy H. King, deceased, with reference to the said Guy H. King calling Paula King his wife, and acknowledging her for his wife, and holding her out to his friends as his wife." It is obvious that the bill presents no concrete question for review, for it fails to set out any fact or statement the witness would have testified to, if permitted. He was offered to testify to "statements made by" the decedent "with reference to the said" decedent "calling Paula King his wife, and acknowledging her for his wife, and holding her out to his friends for his wife." If appellant desired to adduce the testimony of the witness, he should have shown in his bill just what "statements" the witness, if permitted, would have testified that the decedent made to him, and not merely the witness' conclusion as to the effect of those statements upon and "with reference" to the issues in the case. The trial judge was entitled to know just what the proffered testimony was to be, and, until he was informed of it specifically and in such detail that he could properly appraise its competency and materiality, he did not abuse his discretion in rejecting it. The bill of exception presents no question of law, and the assignment of error based thereon has no force on appeal.

██ Even if the witness were permitted to testify to the conclusions set out in the bill, we doubt if it would be admissible as against the objection made to it that its admission would contravene the provisions of article 3716, R. S. 1925, prohibiting parties from testifying as to transactions with decedents in suits of this character. It is true the witness was not a party to the suit, but that fact alone does not relieve him from the operation of the statute, if the other elements of disqualification exist in him. Tannehill v. Tannehill (Tex. Civ. App.) 171 S. W. 1050; Clark v. Briley (Tex. Civ. App.) 193 S. W. 419; Perdue v. Perdue (Tex. Civ. App.) 208 S. W. 353; Id., 110 Tex. 209, 217 S. W. 694, 220 S. W. 322. It is true, further, that he is not interested in the suit as an heir or other person mentioned in article 3716. But it does appear that appellant has assigned to him a sixth or an eighth interest in appellant's cause of action here asserted, and for no other apparent consideration than that of his testimony upon the trial. He thus assumes the position, and is entitled to and is seeking all the benefits a lawful heir, possessing a like interest, would have in the suit as a party thereto. Since he has assumed this position, and legally invokes all its benefits, it occurs to us that he should be subjected to its restrictions. If this is not so, then the heirs in any case expressly encompassed by article 3716 may destroy the purpose and effect of this wise statute by farming out their birthright through real or simulated assignments to those who could or would testify to transactions with the ancestor, which the heirs themselves are prohibited from doing. The effect would be a palpable fraud upon the law which this court is unwilling to sanction.

██ Appellant's fifth assignment of error is based upon his third bill of exception, in which it is recited, simply, that appellant "offered to prove by Guadalupe Sosa Ortiz statements made by Guy H. King, deceased, with reference to Paula King being his wife." It is urged in the assignment that the court erred in rejecting the proffered testimony. But the bill does not disclose what facts the witness, if permitted, would have testified to. The mere fact that the decedent made "statements" to the witness "with reference to Paula King being his wife" was of no probative force, unless it further appear what those statements were, and that this exclusion resulted in injury to appellant. So far as the bill shows to the contrary, the "statements" made to the witness by the decedent might have been adverse to the interest of appellant, who could not in such case complain of their exclusion. The bill of exception is insufficient as a predicate for the assignment of error, which must be overruled. Besides the witness is a half-sister of appellant, and, although not a formal party to the suit, is directly interested in the subject-matter of it, and comes squarely under the ban of article 3716, which prohibits heirs from testifying in an action of this nature to transactions with or statements made by a decedent ancestor. Perdue v. Perdue, supra; Clark v. Briley, supra; Tannehill v. Tannehill, supra; Leahy v. Timon, 110 Tex. 73, 215 S. W. 951; O'Brien v. Bank (Tex. Civ. App.) 241 S. W. 556.

██ It is contended by appellant that the proffered testimony did not concern transactions with a decedent as contemplated in the statute prohibiting such testimony. The controlling issue in the case is that of King's common-law marriage with appellant's mother, and it is proposed to prove by the interested witness that King, the deceased alleged common-law husband, in his lifetime made statements to the witnesses concerning that relation. Without going into a discussion of the question, we conclude the testimony comes clearly within the inhibition of the statute. Holland v. Nimitz, 111 Tex. 423, 232 S. W. 299, and authorities there cited. In the case cited it was said by Judge Spencer:

"The words 'transaction with,' as used in statutes similar to ours relating to the admissibility of transactions with decedents, have often received judicial interpretation and have been held to include every method by which one person can derive impressions

164

or·information from the conduct, condition or language of another. * * * ·

"The object of the statute was to prohibit the interested heirs and legal representatives from testifying to any facts, or opinions, based upon observations, arising out of any transaction with the decedent which the decedent could, if living, contradict or explain. Death having sealed the lips of one of the parties; the law, for reasons founded upon public policy, seals the lips of the other."

Appellant's fifth assignment of error, for the several reasons given, is overruled, and for like reasons his fourth assignment of error must be overruled.

In his proposition under his sixth, ninth, and eleventh assignments of error, appellant complains that the court erred in refusing to permit a named witness to state what was the reputation of the alleged common-law husband and wife as to being married. These assignments appear to be based upon appellant's seventh bill of exceptions. Inspection of this bill of exception discloses that the witness probably qualified himself to testify as to the reputation of the decedents as being husband and wife, whereupon he was asked by appellant's counsel to state what that reputation was. Upon objection the court refused to permit the witness to answer. But the bill does not disclose what answer the witness, if permitted, would have made to the question. So far as the record shows to the contrary, the proposed answer might have been adverse to appellant, in which event the latter could not complain of its exclusion. Obviously the bill of exception presents no error of which appellant may complain, and the assignment based thereon can be given no more force than the bill of exception. This court cannot determine the proposition, in the absence of a showing as to what the witness would have said, had he been permitted to answer the question to which objection was sustained. Accordingly, appellant's sixth, ninth, and eleventh assignments of error will be overruled, for the reasons given, and the seventh and twelfth assignments are overruled, because they present no material error.

The original opinion herein will be withdrawn, and this one substituted therefor.

The judgment is affirmed.