Bertha TATUM, Appellant,

v.

Oscar TATUM et al., Appellees.

No. 15140.

United States Court of Appeals
Ninth Circuit.

Jan. 30, 1957.

---

Arthur N. Greenberg, Los Angeles, Cal., for appellant.

Alan Ross, Los Angeles, Cal., for appellees.

Before POPE, FEE and BARNES, Circuit Judges.

BARNES, Circuit Judge.

Appellant appeals from a judgment entered by the District Court, sitting without a jury, disallowing her claim to the proceeds of a policy of life insurance issued to and upon the life of Erwin or Ervin Tatum[1] under the provisions of the Federal Employees Group Life Insurance Act,[2] and awarding the proceeds thereof to appellees, the decedent's three surviving children by his first marriage.

This action was originally brought against the United States of America and the Metropolitan Life Insurance Company, the insurer. Metropolitan counterclaimed interpleading[3] appellees as defendants. The United States was later dismissed as a party.

On August 29, 1954, group life insurance policy No. 17000–G was issued to the United States Civil Service Commis-

1. Hereafter, Erwin.

2. 5 U.S.C.A. §§ 2091–2103.

3. 28 U.S.C.A. § 1335.

404

sion covering certain Federal employees including the decedent, a postal clerk, Erwin Tatum was insured in the amount of $4,000 upon his life with double indemnity coverage in the event of accidental death. He died by accidental means on December 7, 1954.

The enabling statute and the group policy provide that:

"Any amount of group life insurance and group accidental death insurance in force on any employee at the date of his death shall be paid, upon the establishment of a valid claim therefor, to the person or persons surviving at the date of his death, in the following order of precedence:

"First, to the beneficiary or beneficiaries as the employee may have designated by a writing received in the employing office prior to death;

"Second, if there be no such beneficiary, to the widow or widower of such employee;

"Third, if none of the above, to the child or children of such employee and descendants of deceased children by representation." 5 U.S. C.A. § 2093.

The decedent did not designate a beneficiary. Appellant claims the proceeds as the widow. The sole issue before the trial court and on appeal is whether appellant is Erwin Tatum's widow.

The physical facts are in the main uncontroverted. It appears that the decedent and Mattie (also known as Minnie) Tatum, appellees' mother, participated in a marriage ceremony on January 1, 1927, at Tyler, Texas. Thereafter, they resided together as husband and wife in Texas until 1935, when they separated. Four children were born to this union. There is no evidence in the record that during the intervening years between the date of their separation and May 19, 1943, that either Erwin or Mattie procured a divorce or an annulment of their marriage. On May 19, 1943, Erwin Tatum and appellant, Bertha, entered into a ceremonial marriage

at Prescott, Arizona. At that time, Erwin was serving in the United States Army. Both before and after this ceremony Mattie received Army allotments. On the other hand, following the ceremony, the appellant applied for and was denied an allotment as a serviceman's wife on the ground that she had not produced adequate proof of the dissolution of Erwin's prior marriage. After Erwin's discharge in 1945, he and appellant cohabited in California as husband and wife. In May, 1948, one of Erwin's daughters, Josephine, died and Erwin traveled to Texas to attend the funeral. He met Mattie there and accompanied her back to California, where they resumed marital relations until September, 1948. Erwin then returned to appellant. He lived continuously thereafter with appellant until his death. Meanwhile, Mattie instituted proceedings to obtain a divorce in the Superior Court of California, in the County of Los Angeles. An interlocutory decree was granted to her by default on October 28, 1948. The final judgment of divorce was entered on November 30, 1949.

On various occasions between 1949 and 1954, the decedent and appellant made trips together to Texas where Erwin unsuccessfully sought employment in the postal service. These sojourns were combined business and vacation trips and were all of short duration. No stay extended beyond one month and neither Erwin or appellant relinquished their California jobs. Appellant readily concedes that no domicile was established in Texas on any of these journeys.

The trial court found that at the time of the ceremonial marriage in 1943, Erwin's first marriage was subsisting and undissolved. Since this impediment rendered Erwin's second marriage bigamous and hence void, the court concluded that appellant could not claim the insurance proceeds as the ceremonial wife of the decedent. The court further found that Erwin and appellant did not enter into any agreement to be husband and wife during their brief stays in Texas, and therefore appellant was not

entitled to the proceeds under an asserted common-law marriage. The court also held that appellant was not a putative spouse.

Appellant presents here a three-point attack. She contends initially that the presumption of validity due her ceremonial marriage has not been overcome. Secondly, she urges that the evidence establishes, as a matter of law, a valid common-law marriage in Texas. Thirdly, appellant asserts that she is a putative spouse, and that such status entitles her to the rights of a "widow."

### I. *The Word "Widow."*

■ We must first consider what meaning should be given the word "widow" as used in this Act, and what law should be looked to in determining whether plaintiff is the widow.

The word "widow" is not defined in the statute, and we have found neither judicial nor administrative construction of it. However, it has been interpreted frequently, under the analogous National Service Life Insurance Act, 38 U.S.C.A. § 802(g), to mean lawful widow.[4] The court below so construed the instant statute. We agree with that interpretation. Accordingly, appellant was required to prove that she was the lawful widow of Erwin Tatum.

■ The parties have assumed without discussion that the question of appellant's marital status is to be determined by the law of California. The answer is not that crystal clear. Firstly, we are dealing with the interpretation of a federal statute. Therefore, the question of what law is to govern is in the first instance for the Congress to answer. Here Congress has remained silent.

Under similar conditions, the adjudicated National Service Life Insurance Act cases have produced differing conclusions. One point of unanimity is that state law will govern. But there exists little agreement as to what state law is applicable. Some would view the law of the place of marriage as controlling, Lembcke v. United States, 2 Cir., 181 F.2d 703; others would be guided by the law of the domicile of the parties, either at the time of the marriage, or when the alleged claim accrues, United States v. Snyder, 85 U.S.App.D.C. 198, 177 F.2d 44 (both times New Jersey); Muir v. United States, D.C., 93 F.Supp. 939 (both times California); another court has declined to resolve the matter, Hendrich v. Anderson, 10 Cir., 191 F.2d 242.

In the case at bar the ceremonial marriage took place in Arizona. The legal residences of Erwin and appellant at that time are not clearly shown by the record. Erwin, apparently, was still domiciled in Texas although he was then a member of the Armed Forces. There is no evidence as to appellant's residence. The alleged common law marriage was created, if at all, in Texas. Finally, Erwin and appellant were domiciliaries of California at the time of Erwin's death, when this claim arose. Conceivably, this court could refer to the law of either Arizona, Texas, or California to determine this question. However, an analysis of the authorities in each state leads us to conclude that regardless of which law is applied, appellant cannot prevail. Thus, it is unnecessary to decide whether one of the aforementioned alternatives is the exclusive governing law, or whether a choice exists, and if so, how the selection is to be made.[5]

4. Hendrich v. Anderson, 10 Cir., 191 F.2d 242 (and cases cited therein.)

5. Another choice of law question relates to the law which should control the various presumptions concerning the validity of the second marriage. In the National Service Life Insurance Act cases the courts without discussion have looked to the state law which governs the validity of the marriage as governing the presumptions. See, for example, Briggs v. United States, 90 F.Supp. 135, 116 Ct. Cl. 638; Page v. United States, 4 Cir., 193 F.2d 936. Perhaps the absence of an explicit ruling on this point is attributable to the fact that in respect to these particular presumptions, federal and state law are in accord. See, Marris v. Sockey, 10 Cir., 170 F.2d 599, 601.

## II. *The Ceremonial Marriage.*

 We turn next to a consideration of the Arizona ceremony and the presumptions arising thereunder. It is a rule of almost universal acceptance that when a person has contracted two successive marriages, a presumption arises in favor of the validity of the second marriage, and the burden is upon the party attacking the validity of the second marriage to establish existence of the first marriage, and that such marriage has not been dissolved by death, divorce or annulment at the time of the second marriage. Hunter v. Hunter, 111 Cal. 261, 43 P. 756, 31 L.R.A. 411; Wilcox v. Wilcox, 171 Cal. 770, 155 P. 95; Ryder v. Ryder, 2 Cal.App.2d 426, 37 P.2d 1069; Sanders v. Sanders, 52 Ariz. 156, 79 P.2d 523; Kolombatovich v. Magma Copper Co., 43 Ariz. 314, 30 P.2d 832; McCord v. McCord, 13 Ariz. 377, 114 P. 968. This presumption supersedes the presumption of subsistence that attached to the prior marriage. Sanders v. Sanders, supra; Marsh v. Marsh, 79 Cal.App. 560, 250 P. 411; In re Smith's Estate, 33 Cal.2d 279, 201 P.2d 539; Briggs v. United States, 90 F.Supp. 135, 116 Ct.Cl. 638. It is a presumption not founded in logic but in public policy. The purpose is not only to preserve the relationship of the parties and prevent the stigmatization of offspring as illegitimate, but also to protect and strengthen the social and moral standards of the community.

██ However, the presumption, not being conclusive, is simply a rule of evidence, not one of law. It may be rebutted. Its effect is merely to cast upon the opposing party the burden of overcoming it. What is the nature and extent of this burden? As stated by the California Supreme Court in In re Smith's Estate, supra [33 Cal.2d 279, 201 P.2d 540],

"That burden is sustained if the evidence, in the light of all reasonable inferences therefrom, shows that the first marriage was not so dissolved or annulled. [Citations omitted.] 'There can be no absolute presumption against the continuance of the life of one party to a marriage, in order to establish the innocence of the other party to a subsequent marriage; much less can there be a rigid presumption of a dissolution of the first marriage by divorce, in order to make out such innocence. * * *' In any particular case, the question must be determined, * * * upon a consideration of the attending facts and circumstances, and such inferences as fairly and reasonably flow therefrom.' Jones Commentaries on Evidence, V. 1, 103–104."

Cf. also, McCord v. McCord, supra, 114 P. at page 970. Thus the critical question on this issue is whether the evidence is sufficient to support the trial court's finding that a valid marriage existed between Erwin and Mattie at the date of the former's ceremonial marriage to appellant Bertha.

 There is ample evidence to establish at least prima facie existence of the first marriage. The duly certified marriage certificate was introduced in evidence;[6] Mattie's testimony and Erwin's declarations corroborate the existence of the marriage. It is further argued that appellees were required to negative all possible defects which would render the first marriage invalid. However, no reference is made to California authority compelling the imposition of this heavy burden. Indeed, it appears that the California rule is just the contrary; that is, despite the strength of the presumption of the validity of the later marriage, it merely requires the advocate of the prior marriage to establish by competent evidence a prima facie case of a regularly solemnized prior marriage. Hunter v. Hunter, supra.

---

6. Appellant objected to the admission of the evidence because of lack of authentication. However, her failure to comply with Rule 18, subd. 2(d) of the Rules of this Court, 28 U.S.C.A. precludes her from challenging the trial court's ruling.

This appellees did. Then with two presumptively valid marriages in existence, the ultimate burden rests on the party who advocates the second to prove the invalidity of the first. In re Estate of Smith, supra, but cf. Estate of Borneman, 35 Cal.App.2d 455, 96 P.2d 182; Briggs v. United States, supra. Moreover, even in the absence of a ceremonial marriage, the appellees could rely on a common law marriage formed during Mattie and decedent's eight years of cohabitation as husband and wife in Texas.[7] Against the evidence to the contrary, there is not a scintilla of evidence impugning the existence or validity of the prior marriage.

Obviously, since Mattie testified, the marriage was not terminated by death. Only divorce or annulment remain as possibilities. Here again, there is substantial evidence that the marriage was subsisting in 1943. Mattie testified that she was served with no summons or complaint for a divorce prior to October, 1948; that she, not appellant, received the Army allotments; that appellant discussed prosecuting Erwin for bigamy with her; and that except for an abortive attempt in 1938, she made no endeavor to dissolve the marriage. There is also the 1949 divorce judgment and the property settlement agreement negotiated pursuant thereto. This agreement refers to Erwin and Mattie as "Husband" and "Wife" and they signed as *Erwin Tatum*, Husband, and *Minnie Tatum*, Wife. (Defendants Exhibit "A"). Furthermore, Erwin declared that he had not gotten a divorce because he did not need one. Once again, appellant did not produce any evidence to support the bare presumption.

Appellant singles out individual items of the above evidence and asserts that not one is sufficient to rebut the presumption. While we may grant appellant her contention that each item is not per se sufficient, it can hardly be doubted that cumulatively the evidence, viewed in its entirety, supports the trial court's finding. On the basis of the evidence, we cannot hold that its finding is clearly erroneous. Due respect should have been, and we assume, was paid the presumption, but it could not stand in light of the overwhelming evidence to the contrary.

### III. *The Common-Law Marriage.*

■■■■ Appellant next predicates her claim on an asserted common-law marriage. In California, where appellant and Erwin were domiciled from 1945 until his death, only ceremonial marriages may be contracted.[8] However, California does recognize common-law marriages validly created in states which allow such marriages.[9] Texas is one of those states.[10] This is true even though the parties to the marriage are at that time California domiciliaries. Estate of McKanna, 106 Cal.App.2d 106, 234 P.2d 673.

■■■ The essential elements of a common-law marriage in Texas include a mutual consent or agreement to be husband and wife as a lifelong relationship, cohabitation as husband and wife, and a holding out to the public as husband and wife. Estate of McKanna, supra; Grigsby v. Reib, supra; Bobbitt v. Bobbitt, Tex.Civ.App., 223 S.W. 478; Texas Employers Ins. Ass'n v. Soto, Tex.Civ.App., 294 S.W. 639; Ray v. Thompson, Tex.Civ.App., 261 S.W.2d 195. The court below found that the second and third elements had been satisfied. (Finding of Fact VIII). However, it also found that appellant and the decedent made no agreement to be husband and wife while they were in Texas. (Finding of Fact XIII). Appellant urges (1) the finding is not substantiated by the evidence, and (2) no agreement was necessary to create a common-law marriage.

---

7. Ray v. Thompson, Tex.Civ.App., 261 S.W.2d 195.

8. Cal.Civ.Code, Sec. 55.

9. Cal.Civ.Code, Sec. 63; Colbert v. Colbert, 28 Cal.2d 276, 169 P.2d 633.

10. Grigsby v. Reib, 105 Tex. 597, 153 S.W. 1124.

The issue of the formation of an agreement is one of fact.[11] Accordingly, it was peculiarly within the province of the trier of fact to determine the existence or non-existence of such agreement. The District Judge had the opportunity to hear the testimony and observe the conduct and demeanor of the witnesses. The burden of proof was on appellant.[12] The only evidence adduced to sustain it was her own uncorroborated testimony which the trial court was free to disbelieve.[13] After all, appellant herself in filing her claim to the proceeds of this insurance policy with the insurer relied solely upon the ceremonial marriage and did not even mention a common-law marriage, although space was provided on the form for such an insertion. We cannot say upon a close review of the record that the finding is clearly erroneous. We conclude that it should not be disturbed.

Nor is there merit in appellant's second argument that as a matter of law a common-law marriage was formed after the removal of the impediment by the 1949 divorce judgment. Appellant submits that under Texas law no agreement is necessary in order to create a valid common-law marriage, citing as authority for that proposition Curtin v. State, 155 Tex.Cr.R. 625, 238 S.W.2d 187, and Kelly v. Consolidated Underwriters, Tex. Civ.App., 300 S.W. 981, affirmed Consolidated Underwriters v. Kelly, Tex. Com.App., 15 S.W.2d 229. The Curtin and Kelly cases do not aid appellant. The Kelly case presents a factual situation similar to the one here. The plaintiff claimed compensation under a Workmen's Compensation Act, Vernon's Ann. Civ.St. art. 8306 et seq., as the surviving widow of the insured. There the parties, without benefit of ceremony, lived together for a number of years in Louisiana under an agreement to be husband and wife, a situation that in Texas would have constituted a common-law marriage. During this period the deceased worked a year in Texas. Plaintiff visited him there, and they spent one month living together. However, they recognized that their absence was temporary, being for the purpose of securing employment, and during this time they maintained their home in Louisiana. The Court of Civil Appeals concluded that "their temporary sojourn in the states recognizing common-law marriages did not convert their illegal relations into a lawful marriage." [300 S.W. 982.] Thereafter, the decedent deserted plaintiff and she then legally wed another man. She in turn abandoned her husband five years later, returning to the decedent in Texas to establish residence as husband and wife. They lived there together from October, 1925 to January, 1926 when the decedent died. Unbeknownst to them, claimant's ceremonial spouse had died on Thanksgiving Day of 1925. The court found no new agreement to have been made, but held that "sound public policy impels the law to infer consent 'to have been given at the first moment when the parties were able to enter into the contract.'" In affirming the decision, the Commission of Appeals disapproved of the rationale contained in the above quote, holding instead that "we do agree that the facts as found authorized an inference of fact as to matrimonial intent at a time when no legal impediment existed." [15 S.W.2d 230.] The court went on to state, and we quote from an excerpt incorporated and expressly approved in the subsequent Curtin case:

"It is undoubtedly true that the agreement for marriage, * * * so long as the legal impediment existed, was of no effect. The consummation of the marriage, however, cannot be denied for the want

11. Kelly v. Consolidated Underwriters, Tex.Civ.App., 300 S.W. 981, Consolidated Underwriters v. Kelly, Tex.Com.App., 15 S.W.2d 229.

12. Brown v. Brown, Tex.Civ.App., 115 S. W.2d 786; King v. King's Unknown Heirs, Tex.Civ.App., 16 S.W.2d 160.

13. United States v. Fotopulos, 9 Cir., 180 F.2d 631.

of agreement, but must be denied because of the legal impediment which prevented its consummation. * * * So here the facts showing that, after Brown's death, the parties continued their relations deporting themselves as husband and wife and considering themselves such, are sufficient to prove as a *matter of fact* that they intended their relations to be marital, and since there then existed no legal impediment, their agreement and relations were valid and lawful. Their continued living together as husband and wife after the removal of the impediment bespeaks a continued intention and agreement, day by day, to be husband and wife, * * *."

The Curtin case itself involved a criminal prosecution for wilful neglect and failure to support children. The defense was that the children were illegitimate, the accused's prior marriage being undissolved at the time of his marriage to the prosecutrix. Both the defendant and the prosecutrix were legal residents of Texas. On original hearing of the appeal the court reversed the conviction because of erroneous instructions relating to putative marriage and the submission of that issue to the jury. In so doing, as previously stated, the court approved the rule of the Kelly case. On rehearing, the court decided to affirm the judgment. We find nothing in the opinion denying rehearing after affirmance which detracts from the court's earlier approval of the Kelly case. The court's discussion at that point dealt with the ripening of a putative marriage into a common-law marriage. The court inferred that in such circumstances that either no agreement was necessary, or that it would be implied from continued cohabitation. In the instant case, whatever the nature of the relationship may have been at the time of the ceremonial marriage, it is clear, as will be discussed forthwith, that when appellant and the decedent went to Texas their relationship was

meretricious. Moreover, it should be remembered that the Curtin case involved Texas domiciliaries. We take it that the ultimate holding of the court was that cohabitation by Texas domiciliaries post removal of the impediment was sufficient to show the existence of a common-law marriage.

To summarize Texas law, it appears that an agreement is necessary, but that in the case of Texas residents, particularly where the relationship is not meretricious, mere continuance of marital relations suffices to show such agreement. On the other hand, in cases involving out-of-state residents, particularly where the relationship is meretricious, it is essential to prove a new agreement.

In the McKanna case, supra, the District Court of Appeal of California had occasion to analyze Texas law on this subject. That case, too, involved factual conditions substantially akin to that at bar. There plaintiff sought a family allowance for the executor as the common-law wife of the deceased. It seems that the decedent, while domiciled in California, journeyed to Texas on a business and vacation trip in June, 1946. He there met the claimant. Shortly thereafter, they moved into the same rooming-house and later announced to the landlord that they were leaving to get married, and upon their return, that they were married. Actually, the couple had decided to dispense with the formality of a marriage ceremony. They registered as husband and wife in various hotels in Texas. They returned together to California where they held themselves out to be husband and wife. The court affirmed the order granting the allowance, holding that the evidence was sufficient to support the trial court's finding that a common-law marriage was created. The one salient difference between that case and the one at bar—the posture in which it came to the appellate court—is decisive in distinguishing them. Evidence that might sustain a judgment is not necessarily such conclusive and

overwhelming evidence as to warrant overthrowing a finding to the contrary.

The California court, alluding to the Kelly case, ably and aptly analyzed Texas law thusly [106 Cal.App.2d 106, 234 P.2d 677]:

"From the quotations of the foregoing case it appears to be the view of the court that where the contract of marriage is invalid under the law in the state in which it is made, the status of the parties thereafter will be regarded as being meretricious and that that status will follow them during any stay in Texas, unless there is a new agreement of marriage made in Texas, followed by cohabitation and a public holding-out, or unless they become domiciled in Texas. If the parties become domiciled in Texas, then and in that event there is no necessity to prove a new agreement of marriage in Texas, but instead consent to a new marriage within that state will be inferred by reason of the original intent to marry if there be cohabitation in Texas and a public holding-out by the parties that they are husband and wife. In short, domicile is an aid but not a prerequisite to sustain the claim of a common-law marriage in Texas where the original contract of marriage was invalid."

We agree with that cogent commentary on Texas law. Here no domicile in Texas was found. It is true that none was necessary,[14] but in the absence thereof, it was incumbent on appellant to prove an agreement. She did not carry that burden. Therefore, she cannot avail herself of the status of common-law wife.

### IV. *The Putative Marriage.*

The third and final basis of appellant's claim is that of putative spouse. At the outset it should be observed that we entertain serious doubt as to whether a putative spouse qualifies as a lawful "widow." By hypothesis, the putative spouse is *not* the lawful wife, but rather a person who because of a good faith belief in the existence of a valid marriage, is viewed by state law to be the equivalent of the lawful wife for some purposes. We reiterate that the word "widow," as employed in this Federal statute, presents a Federal question of interpretation. Lembcke v. United States, supra. Under the similarly phrased National Service Life Insurance Act, it has been held that the putative spouse does not come within the scope of the statute.[15] But we need not finally determine this issue, since it is clear that appellant is not a putative spouse.

It may well be that appellant engaged in the Arizona ceremony in good faith;[16] but from her own lips comes the admission that she subsequently learned of the continuing existence of the prior marriage. In this regard her response to the court's questions is illuminating:

"The Court: Before you entered into this ceremony in Arizona had he told you that he had obtained a divorce from his first wife?"

"The Witness: Yes, he did."

"The Court: Then you found out that wasn't true later on?"

"The Witness: When I heard from the Army from the Red Cross."

"The Court: But afterward you found out that there was a divorce proceeding here in Los Angeles?"

---

14. Estate of McKanna, supra.

15. Muir v. United States, supra. The case cited by appellant to support award of the proceeds to the putative spouse, Speedling v. Hobby, D.C., 132 F.Supp. 833, 836, is not in point. There the Social Security Act, 42 U.S.C.A. § 401 et seq., was involved, and the same District Judge who decided the Muir case, supra, specifically noted that "claimant does not have to be the lawful widow of the decedent, but rather must have the same status relative to taking intestate personal property as a widow."

16. The only evidence on this point was appellant's own statements. The trial court was not required to accept as true her uncontradicted testimony. United States v. Fotopulos, 9 Cir., 180 F.2d 681.

"The Witness: Yes."

"The Court: And you knew then that he hadn't told you the truth?"

"The Witness: That is right."

(Tr. 116).

Again,

"The Court: Just a moment. I want to ask you a question. You knew that Mr. Tatum got a divorce from his first wife, did you not?"

"The Witness: That was when he was discharged, yes."

"The Court: You knew when the case came up in court here in Los Angeles?"

"The Witness: Yes."

"The Court: And you and he were living together at that time as husband and wife?"

"The Witness: Yes, sir."

"The Court: So you did know that he had a previous marriage that had not been terminated at that time."

"The Witness: Yes, at that time."

(Tr. 191).

Despite her knowledge of the overlapping marriages, appellant did nothing to rectify the situation, although she did remark to Mattie on one occasion that she was going to have Erwin sent to prison for bigamy.

It is no answer to appellant's failure to act that in reply to her comment, "Now is the time for us to fix this and do it over," Erwin assured her everything was all right and that they were already married under Texas law. It strains credulity that appellant who appears to be neither unintelligent nor naive relied on that bland statement in the face of the facts and Erwin's previous misrepresentations. That she was fully cognizant of her marital status, or rather lack thereof, is demonstrated by her comments to one Mabel Barnes at the time of Erwin's funeral.

"Well, Mrs. Barnes asked her (appellant) if they were married and she told her no, and she said, 'You should have made him marry you.' "

(Tr. 152).

In Vallera v. Vallera, 21 Cal.2d 681, 134 P.2d 761, the Supreme Court of California held that the sina qua non of a putative marriage is a good faith belief in the validity of the marriage at its inception. Appellant refers us to no California case nor could diligent research discover any, which would permit a person to claim the rights of a putative spouse when such person, after acquiring knowledge of the infirmity in his or her marriage, continues to live under the same conditions, without undertaking any action to perfect the marital status. Although this question is evidently novel in California, we feel certain that the courts of that State would, consonant with the decision in the Vallera case, supra, deem it essential that the good faith belief continue throughout the life of the marriage. The courts in other jurisdictions which have considered the question have so held.[17] Accordingly, when appellant discovered the subsistence of the first marriage she ceased to occupy, if she ever had, the status of putative spouse.

We are not unaware that our resolution of the instant case may entail hardship to the appellant. It is an unfortunate turn of circumstances that she is embroiled in a legal contest against the children of the man with whom she lived for over eleven years. It is all the more unfortunate that in this 'winner take all' conflict, she receives nothing. Yet, we note, if the decedent had definitely desired that the proceeds of the policy should go to appellant, he could easily have fulfilled that wish by naming her beneficiary. This is indeed a hard case, but that fact does not permit this court to heed the old saw and make what we consider to be bad law.

The decision of the District Court is affirmed.

17. Howard v. Ingle, La.App., 180 So. 248; Funderburk v. Funderburk, 214 La. 717, 38 So.2d 502; Curtin v. State, supra.

See also, 55 C.J.S., Marriage, § 35, p. 878.