Mary SPEARMAN, Defendant-Appellee,

v.

Viva SPEARMAN, Defendant-Appellant.

No. 72–2965.

United States Court of Appeals,
Fifth Circuit.

July 9, 1973.

Rehearing Denied Aug. 13, 1973.

C. H. Erskine Smith, Birmingham, Ala., Herbert A. Schwartz, Pacific Grove, Cal., for defendant-appellant.

Charles E. Floyd, C. Neal Pope, Phenix City, Ala., for defendant-appellee.

Before BELL, INGRAHAM and RONEY, Circuit Judges.

RONEY, Circuit Judge:

This case requires us to decide which of two claimants qualifies as the "widow" under a policy of life insurance issued pursuant to the Federal Employees' Group Life Insurance Act, 5 U.S.C.A. § 8701 et seq. The District Court found that, although both claimants had married the insured, the second wife did not qualify as the insured's "lawful widow" because she did not establish that insured's first marriage had been terminated by either divorce or annulment. We affirm.

At the time of his death, on October 1, 1969, Edward Spearman was insured by Metropolitan Life Insurance Company under Group Policy No. 17000–G in the amount of $10,000. The policy provided that, if no beneficiary were designated, the proceeds were to be paid to the "widow" of the insured. The parties stipulated that the policy designated no beneficiary.

After Spearman's death, both defendants claimed to be his "widow" and claimed the proceeds of his life insurance policy. The first wife, Mary Spearman, is a resident of Alabama and was married to insured on October 2, 1946, in Russell County, Alabama. Two children, twin girls, were born of this marriage, and both carry the surname of Spearman. The second wife, Viva Spearman, a resident of California, married insured on June 7, 1962, in Monterey County, California. This marriage produced no offspring.

Metropolitan filed this interpleader action and paid the proceeds of the policy into the registry of the District Court.

## The Applicable Law

### A. The Definition of "Widow"

The decision in this case turns on the definition of the term "widow" as used in the life insurance policy. The policy itself does not define "widow," nor does the Federal Employees' Group Life Insurance Act, supra, provide any guidance. This question is not however, one of first impression. In Tatum v. Tatum, 241 F.2d 401 (9th Cir. 1957), the Ninth Circuit, by looking to judicial interpretations of an analogous federal statute, the National Service Life Insurance Act, 38 U.S.C.A. § 701 et seq., determined that the term "widow" meant "lawful widow." The Tatum court then turned to state law to provide a definition of the term "lawful widow." Other courts look to state law for a definition of "widow," apparently following the lead of De Sylva v. Ballentine, 351 U.S. 570, 76 S.Ct. 974, 100 L.Ed. 1415 (1956), which held that federal courts should look to state law in defining terms describing familial relations. "[T]here is no federal law of domestic relations,

which is primarily a matter of state concern." 351 U.S. at 580, 76 S.Ct. at 980. *See, e. g.,* Brinson v. Brinson, 334 F.2d 155 (4th Cir. 1964); Lembcke v. United States, 181 F.2d 703 (2d Cir. 1950).

■ This case is complicated by the fact that the widows each married Spearman, and now live, in different states. For the validity of each marriage viewed separately, the law of the state where the marriage occurred controls. For the law to determine which of two conflicting marriages is the valid one, and therefore to determine which spouse is the "widow," we hold that California law should apply, following the *Brinson* case, *supra,* which held that the law of an insured's domicile at the time of his death should govern. *See also* Grove v. Metropolitan Life Insurance Co., 271 F.2d 918 (4th Cir. 1959). This holding is appropriate here since California was not only Spearman's domicile, but also he accepted Government employment in California and entered into the insurance contract while there.

■ California law is in accord with the general rule which provides that a second marriage cannot be validly contracted if either spouse is then married. *E. g.,* People v. Coronado, 57 Cal.App.2d 805, 135 P.2d 647 (1943); *cf.* Sohnlein v. Winchell, 230 Cal.App.2d 508, 41 Cal. Rptr. 145 (1964).

■ In a contest between conflicting marriages under California law, once the first wife presents evidence that her marriage has not been dissolved, then the burden of persuasion shifts to the second wife to establish that her spouse's marriage to his first wife had been dissolved. Otherwise, the first wife is deemed to have established her status as the lawful wife.

According to the California rule, as in most states, the process of establishing which wife enjoys the status of lawful wife involves these shifting presumptions and burdens of persuasion:

1. Initially, when a person has contracted two successive marriages, a presumption arises in favor of the validity of the second marriage. Cal.Evid.Code § 663; Tatum v. Tatum, *supra*; Hunter v. Hunter, 111 Cal. 261, 43 P. 756 (1896); Vargas v. Superior Court, 9 Cal.App.3d 470, 88 Cal.Rptr. 281 (1970); Berg Estate, 225 Cal.App.2d 423, 37 Cal. Rptr. 538 (1964). Absent any contrary evidence, the second wife is deemed to be the lawful wife.

2. The presumption of validity accorded the second marriage is, however, merely a rule of evidence. It is a rebuttable presumption, the effect of which is to cast upon the first wife the burden of establishing the continuing validity of her marriage by demonstrating that it had not been dissolved by death, divorce, or annulment at the time of the second marriage. Cal.Evid.Code §§ 604, 606; Tatum v. Tatum, *supra,* 241 F.2d at 406, citing In re Smith's Estate, 33 Cal.2d 279, 201 P.2d 539, 540 (1949); Hunter v. Hunter, *supra*; Vargas v. Superior Court, *supra*; Berg Estate, *supra.*

3. California formerly required the first wife to prove that her husband had not dissolved their marriage by showing that no record of either divorce or annulment existed in any jurisdiction in which the husband may have resided. *See* Nidever Estate, 181 Cal.App.2d 367, 5 Cal.Rptr 343 (1960). This strict burden has now been somewhat relaxed. The current rule is that, to rebut the presumption of validity inuring to the second or subsequent marriage, the first spouse need examine the records of only those jurisdictions in which either she or her husband have been in fact domiciled. *See* Goldberg Estate, 203 Cal. App.2d 402, 21 Cal.Rptr. 626 (1962).

4. If the first wife shows that an examination of the pertinent records of such jurisdictions and all of the available evidence demonstrate that her marriage remains undissolved, the burden of demonstrating the invalidity of the first marriage then shifts to the party asserting its invalidity, the second wife in this case. In re Smith's Estate, *supra.* Unless the second wife then can establish

that her husband's first marriage has been dissolved, the first wife qualifies as the "lawful widow."

### B. *The Putative Spouse Doctrine*

Even if the second wife cannot qualify as the insured's "widow," she may nevertheless be entitled to one-half of the proceeds of the life insurance policy as insured's "putative spouse." *cf.* United States v. Robinson, 40 F.2d 14 (5th Cir. 1930); *but see* Tatum v. Tatum, *supra*.

■ A putative spouse is one whose marriage is legally invalid but who has engaged in (1) a marriage ceremony or a solemnization, on the (2) good faith belief in the validity of the marriage. According to Estate of Foy, 109 Cal. App.2d 329, 240 P.2d 685 (1952),

> [t]he term "putative marriage" is applied to a matrimonial union which has been solemnized in due form and good faith on the part of one or of both of the parties but which by reason of some legal infirmity is either void or voidable. The essential basis of such marriage is the belief that it is valid.

109 Cal.App.2d at 331–332, 240 P.2d at 686. *See also* Tatum v. Tatum, *supra*; Vallera v. Vallera, 21 Cal.2d 681, 134 P. 2d 761 (1943); Flanagan v. Capital National Bank, 213 Cal. 664, 3 P.2d 307 (1931).

■ The theory under which the "putative spouse" is entitled to recover a share of the insurance proceeds is that, as the insured's "putative spouse," she is entitled to share in the property accumulated by the family unit during its existence. The general rule, therefore, is that the "putative spouse" is entitled to the same share in this property as would have been accorded a de jure spouse under the community property laws. *See, e. g.,* Estate of Ricci, 201 Cal.App.2d 146, 19 Cal.Rptr. 739 (1962).

In effect, the innocent putative spouse was in partnership or a joint enterprise with her spouse, contributing her [earnings and services] to the common enterprise. Thus, their accumulated property was held in effect in tenancy-in-common in equal shares. Sousa v. Freitas, 10 Cal.App.3d 660, 89 Cal.Rptr. 485, 489 (1970). *See also* Blache v. Blache, 69 Cal.App.2d 616, 160 P.2d 136 (1945); *but see* Estate of Ricci, *supra*.

The California courts have uniformly held that, when the premiums on an insurance policy have been paid with community funds, the chose in action represented by the policy constitutes community property. *E. g.,* New York Life Ins. Co. v. Bank of Italy, 60 Cal.App. 602, 214 P. 61 (1923); Bazzell v. Endriss, 41 Cal.App.2d 403, 107 P.2d 49 (1940). This rule was applied to the proceeds of a National Service Life Insurance Policy in Wissner v. Wissner, 89 Cal.App.2d 759, 201 P.2d 837 (1949), reversed on other grounds, 338 U.S. 655, 70 S.Ct. 398, 94 L.Ed. 424 (1950). Thus, where premiums on an insurance policy are paid during the existence of a "putative marriage," the proceeds should be treated according to the community property laws.

Since the proportionate contribution of each spouse is immaterial in California, Vallera v. Vallera, *supra,* and assuming that all of the insurance premiums were paid during the time when the "putative spouse" believed in good faith that she had a valid marriage, then it is presumed that she contributed one-half of the premiums and is therefore entitled to one-half of the proceeds.

### The Decision

Applying these rules to the facts before it, the District Court first looked to the law of Alabama and concluded that Mary, the first wife, was validly married in Alabama in 1946. The subsequent marriage to Viva in 1962 in California was valid under California law, unless there was a preexisting marriage. At this point, the presumption in favor of the most recent marriage to Viva required Mary to show that her marriage had not been dissolved or annulled at the

time of the insured's marriage to Viva. This showing she successfully made by establishing that no petition for annulment or divorce had been filed, by either herself or the insured, in any of their known domiciles since 1946, including Columbus, Georgia, Phenix City, Alabama, and Monterey, California. *See* Tatum v. Tatum, *supra*; Hunter v. Hunter, *supra*; Vargas v. Superior Court, *supra*; Berg Estate, *supra*; Goldberg Estate, *supra*.

After Mary had rebutted the presumption of validity initially attaching to Viva's marriage, the burden of persuasion shifted to Viva. *See* In re Smith's Estate, *supra*. This burden failed for want of proof: Viva introduced no credible evidence that either Mary or the insured had ever been a party to any legal proceeding that had annulled or dissolved their marriage. The District Court then correctly ruled that Mary had established the continuing validity of her marriage to the insured and that Viva had failed to establish otherwise.

█ Having failed to prove her claim as insured's "widow" under the policy of life insurance, Viva then pursued the theory that, as the insured's "putative spouse," she was entitled to one-half of the proceeds of the life insurance policy. The District Court found that Viva could not qualify as the insured's "putative spouse" because she could not meet the requirement of a good faith belief in the existence of a valid marriage. This finding is not clearly erroneous, and must remain undisturbed under Rule 52(a), Fed.R.Civ.P. The evidence before the District Court showed that Viva knew (1) that the insured had fathered two children by Mary Spearman, (2) that Mary and both children carried the Spearman name, (3) that Mary had secured a support decree against the insured, (4) that the insured returned to Alabama each year on his vacation, and (5) that while on these vacations the insured lived in the same house with Mary and his two children. On these facts,

the District Court's finding of an absence of good faith was amply supported. As the District Court stated in its thorough opinion, "Viva admits that she was aware of the possibility, if not the likelihood, of [insured's] prior marriage to Mary, and, yet, she took no steps to perfect her marital status."

█ Viva contends that the District Court's view of the "bona fide belief" requirement rests upon an erroneous interpretation of the California decisions. She argues that these decisions require only that the "putative spouse" have neither actual knowledge of invalidity nor a belief that the marriage was invalid. Under Viva's view, then, so long as she did not actually know of her marriage's invalidity and maintained a belief in its validity, no matter how unreasonable that belief may have been, she qualified as the insured's "putative spouse." We decline to adopt such a test of good faith. Rather, we think that the District Court correctly held that a good faith belief in the validity of the marriage must be posited on a view of the facts known to the spouse in question.

Such an objective test is perfectly consonant with the California decisions that have developed and applied the "putative spouse" doctrine. Viva argues that, since the decisions applying the good faith standard have always involved spouses who either knew or believed that their marriage was actually invalid, *e. g.*, Tatum v. Tatum, *supra*; Estate of Bialy, 169 Cal.App.2d 479, 337 P.2d 511 (1959); Vallera v. Vallera, *supra*; Flanagan v. Capital National Bank, *supra*; Schneider v. Schneider, 183 Cal. 335, 191 P. 533 (Cal.1920), the test of good faith is satisfied by a spouse who has no actual knowledge of the marriage's invalidity and who believes in its validity. We disagree. Although no California case has been cited to us that tests good faith by examining its reasonability, the cases that have discussed good faith do not preclude such an approach. Two cases, Estate of Foy, *supra*, and Estate of Krone, 83 Cal.App.2d

766, 189 P.2d 741 (1948), specifically advert to the fact that the "putative spouses" involved in each had received no information about the invalidity of their marriages. The language in all of these California "putative spouse" cases indicates that a broad approach to good faith is proper. Nowhere do these cases explicitly reject an objective test of good faith.

Costs will be taxed to appellant.

Affirmed.