106 Cal.App.2d 126 (1951)
Estate of EDWIN A. McKANNA, Deceased. FATHER FLANAGAN'S BOYS TOWN, Appellant,
v.
NANCY M. McKANNA, Respondent.
Civ. No. 18348. 
California Court of Appeals. Second Dist., Div. One. 
Aug. 16, 1951.
 Carl C. Katleman, George Appell and Monsky, Grodinsky, Good & Cohen for Appellant.
 John M. Sherman and Robert M. Fisk for Respondent.
 HANSON, J. pro tem.
 In the court below the respondent sought and obtained an order directing the executor to pay her a family allowance as the common-law wife of the decedent *127 Edwin A. McKanna. The case here on appeal turns upon the question whether or not at the time of the death of McKanna on April 25, 1950, the respondent was in fact his common-law wife. The alleged common- law marriage was claimed by respondent to have taken place in Austin, Texas, on September 3, 1946.
 [1] Appellant's challenge is based primarily upon the ground that the evidence was insufficient to sustain the essentials of a common-law marriage in Texas which it contends requires evidence (1) of an agreement to be husband and wife as a lifelong relationship; (2) that it be followed by cohabitation; (3) that it be followed by publicly holding themselves out as man and wife, and (4) that such holding out must occur while the parties are domiciled within the state of Texas or while residing in Texas they were possessed of an intention to acquire a domicile in that state.
 As respondent agrees with appellant that evidence of the first three named essentials are requisites under Texas law we shall assume for the purposes of the opinion that appellant is correct. (But see 25 Tex.L.Rev. 681.) Respondent, however, sharply challenges the assertion that domicile is a factor as contended by appellant.
 We turn first to a statement of the facts leading up to the alleged common-law marriage as they could have been found by the trial court on the evidence.
 In June, 1946, the decedent, Edwin, being at the time domiciled in California, went to San Antonio, Texas, on a business and vacation trip. At San Antonio he took lodgings at a lodge where respondent Nancy Davis likewise had lodgings. She was a Texas girl and at the time employed as a cashier at a nearby coffee shop where she first met Edwin. She at once began having dates with him.
 In July, 1946, she changed her employment to that of secretary to an official of a department store and thereupon moved to a room in a rooming house run by a Mr. and Mrs. Temple. About three weeks later Edwin engaged a room for himself in the same rooming house. The testimony of Mrs. Temple is that on the morning of September 3, 1946, Edwin and Nancy came downstairs with traveling bags and Nancy announced to Mrs. Temple, in the presence of Edwin, that they were driving to Austin, Texas, to be married; he added that he was giving up his room and that on the couple's return they would occupy Nancy's room. On their return the next day *128 Nancy testified that Edwin announced to Mrs. Temple that "she is mine now; she is my wife." Mrs. Temple testified she recalled the first part of the statement, but could not positively recall the second. She did testify she and her husband congratulated the couple, who proceeded to occupy Nancy's room until some four days later when the couple drove to St. Louis. A day or two after the couple had returned from Austin Mrs. Temple introduced them to a neighbor as Mr. and Mrs. McKanna.
 The respondent Nancy testified that previous to the trip to Austin, Edwin had not only proposed marriage to her but had also asked that she accompany him to St. Louis where he wished to undergo a facial operation; that she thereupon suggested he should go alone and that they marry upon his return; that after further discussions both agreed they would shortly proceed to Austin to be married. Her testimony is that on their arrival in Austin they decided to dispense with the formality of a marriage ceremony. In her own words: "Mr. McKanna asked me if I would live with him as his wife and assume the duties as wife to him, and I said I would; and he said he would live with me as my husband." At Austin the couple registered in a hotel as Edwin A. McKanna and wife--the registration signature, however, was in the hand of respondent, who testified she signed at the direction of Edwin. Whether Edwin was inebriated or not at the time is not disclosed, but that he was an alcoholic before and after he met Nancy and until his death is the record in this case. Except in this one instance, hotel registers thereafter were always signed by Edwin, never under fictitious names, but always as "Edwin A. McKanna and wife." That Edwin desired to marry Nancy before the couple went to Austin is corroborated by Mrs. Temple, who stated the subject of marriage was many times discussed in her presence in her home and moreover that Edwin also sought Mrs. Temple's help in getting Nancy to marry him.
 The couple returned from St. Louis to Texas, registering first at a hotel in Fort Worth and later at another in San Antonio as Edwin A. McKanna and wife. Then they went to California. In California, Edwin always introduced respondent as "my wife" or as Mrs. McKanna. He bought a house in which they resided until his death. He told his lawyer when he drew his will that Nancy was his wife and made the same statement to a trust officer of a bank which handled the *129 trust from which McKanna derived his income. Except during two periods when Edwin was confined for alcoholism, Nancy always lived with him.
 Upon the facts stated it seems to us abundantly clear that the evidence completely sustains the trial court's finding that the couple became husband and wife in Texas in accordance with its common law. Under the law of Texas, as we view it, there are at most three essentials to a valid common-law marriage. Texas, unlike most of the states, views a common-law marriage not as a mere contract but as a status to which mutual consent is essential, implemented and not attained until the parties publicly assume such relation by holding themselves out as husband and wife. (Grigsby v. Reib, 105 Tex. 597 [153 S.W. 1124, Ann.Cas. 1915C 1011, L.R.A. 1915E 1]; 35 Am.Jur. 200.) The mutual consent or agreement need not be expressed or evidenced by any particular form of words (Consolidated Underwriters v. Kelly, (Tex.Com.App.) 15 S.W.2d 229; Associated Indemnity Corp. v. Billberg, (Tex.Civ.App.) 172 S.W.2d 157). The meaning of the words of consent, testified to by respondent, means matrimony to us in our view of the law of Texas, abetted and interpreted, as the words are, by the prior intent of the parties as testified to not only by the respondent but also by the witness Mrs. Temple.
 The second essential to a valid common-law marriage is that the parties cohabit together as man and wife. (Grigsby v. Reib, supra.) As appellant does not question that there is adequate evidence as to this essential, we discuss it no further.
 The third essential to a valid common-law marriage under the laws of Texas is that the parties publicly hold themselves out as man and wife (Grigsby v. Reib, supra; McChesney v. Johnson, (Tex.Civ.App) 79 S.W.2d 658). On this point appellant contends that there was no public holding out in Texas, and this it contends was required regardless of any subsequent public holding out in states other than Texas. We think it may be conceded, as appellant argues, that a registration by a man and woman on a hotel register is sometimes equivocal. This is particularly true where a fictitious name is used. But here no fictitious name was used when the couple registered in the hotel at Austin or when they registered at hotels in Fort Worth or in San Antonio on their return from St. Louis. In fact, at no time from September 3, 1946, *130 until Edwin's death in April, 1950, was any fictitious name used by either Edwin or Nancy, except in one instance when Nancy, to aid the family budget, was employed under the name Nancy Davis, using her security card number which had been issued to her under that name prior to September 3, 1946. The argument that this implied Nancy was single is entirely pointless, as tens of thousands of married women use their maiden names when employed. In addition to the hotel registrations there is the testimony of Mrs. Temple that Edwin sought her assistance in getting Nancy to consent to marry him; the statements of the couple to Mrs. Temple on September 3, 1946, that they were going to Austin to get married; the statements by Edwin made to her on the return of the couple next day; the congratulations offered by the Temples. There was then, within the state of Texas, a sufficient public holding out by the couple of the fact that they were husband and wife, and the trial judge was fully justified in so finding.
 There appears to be no square holding by the courts of Texas as to whether or not there must be a public holding out within the state of Texas. However, it is of some note to observe that the Attorney General's Department of Texas in 1946 ruled there is no such requirement. In an opinion by that office (0-7529 (1946)), Judge Speer, in defining the term "cohabitation" requisite to a common-law marriage, said: "It merely means the living together of a man and woman under agreement for marriage in the matrimonial sense-- ... such as ... the holding out of each other as husband and wife, the adopting by the woman of the husband's name, and the use thereof, the execution of deeds or other instruments in a manner indicating their status to be husband and wife. ... Any one or more of the acts ... will have probative force sufficient to consummate the marriage having its inception in the previous contract. ... It can make no difference where such act or acts of assumption or holding-out take place. ... The publicizing of such a marriage by a proxy ceremony, ... the statements of the parties that they were married, ... the exchange of letters addressed by the one to the other of such a character as to recognize the status, ... or any other act recognizing the relation as marriage, would in law be sufficient to show the consummation that would make the union true marriage." (Italics supplied.)
 That a single act of publicly holding forth as husband and wife within the state of Texas, followed by a like holding *131 forth in other states, is sufficient is the holding in Bobbitt v. Bobbitt, (Tex.Civ.App.) 223 S.W. 478. In that case it was said:
 "A large part of appellant's brief is in support of his claim that the finding of the jury that a common-law marriage between the plaintiff and the defendant was entered into and consummated in Texas is manifestly wrong and should be set aside. ..."
 "It is not disputed that during practically all the time from May, 1886, to March, 1916, the plaintiff and defendant lived and cohabited together. The plaintiff maintains that this relation was preceded by an agreement to live together as husband and wife, and this agreement was immediately followed and consummated by the said parties living together in such status and continuing in such relation throughout said period of time, so as to constitute the relation a common-law marriage within the decision of the Supreme Court in the case of Grigsby v. Reib, 105 Tex. 597, 608 [153 S.W. 1124, Ann.Cas. 1915C 1011, L.R.A. 1915E 1]."
 "The defendant, on the other hand, contends that the relation in its inception was meretricious and continued so at all times while the parties were together in Texas; that, while there is sufficient evidence to justify the conclusion that the plaintiff and defendant did live together as husband and wife in other states, Louisiana, Mississippi, and Arkansas, a common-law marriage is not valid in such states, and the acts of the parties in such states cannot be taken as a consummation of an agreement of marriage without ceremony in Texas. ..."
 "... The appellant (husband) is supported by the testimony of a great number of witnesses, and the plaintiff (appellee) is corroborated as to the status in Texas by the direct testimony of only one witness. However, she is corroborated and the plaintiff's evidence to some extent discredited by the production of the time books and payrolls. The long continuance of the status shown to have existed in the other states affords some evidence that it was a continuance of a status previously established in Texas, and that the relation from its beginning was lawful, and not meretricious. It is natural that the longer the status was continued the stronger would be the proof of its existence."
 Notwithstanding what has so far been said, appellant contends that there is a further essential to the validity of a common-law marriage in Texas, i.e., that the parties be *132 domiciled in the state at the time of the alleged agreement to marry, or that at the time there was an intention to acquire a domicile in the state. In view of the fact that there is no such requirement to a ceremonial marriage in Texas and the constant reiteration by its courts that there are at most only three essentials to a common-law marriage in Texas, of which essentials domicile is never referred to, we see no merit in the contention. The case of Kelly v. Consolidated Underwriters, (Tex.Civ.App) 300 S.W. 981, affirmed by the Commission of Appeals, in 15 S.W.2d 229, upon which appellant relies, we do not regard as an authority for the proposition. In that case it was shown that the parties, "citizens of Louisiana, ... began living together and cohabiting as husband and wife, under an agreement that they would be husband and wife, on conditions that in Texas would have constituted a common-law marriage." They thus lived from the year 1902 to the year 1920. "... during all these years they maintained their home at Amelia, La., recognizing that their absence from their home was only of a temporary nature, for the purpose of securing employment, and Louisa's visits to Joe were purely in the nature of visits, and without any intention whatever of acquiring a residence in any of those states."
 "Under the statement as made, the law of Louisiana declared the relations between Joe and appellant illegal and meretricious, and their temporary sojourn in the states recognizing common-law marriages did not convert their illegal relations into a lawful marriage."
 The court goes on to say that in 1920 Joe deserted Louisa, who, believing him dead, married one Brown, residing with the latter in her home in Louisiana until 1925, when, upon learning that Joe was not dead but was residing in Beaumont, Texas, she immediately left Brown and went to Texas to live with Joe, and "lived with him continuously from that date as his wife until his death on the 19th of January, 1926. They resumed their relations with the intention of living together as husband and wife until their death. Joe Kelly introduced her to his Beaumont friends as his wife, and she acknowledged him openly as her husband. They lived and cohabited as husband and wife, and received their friends in their home as such, and their friends recognized them as husband and wife. The relations between Joe and appellant were such that, except for the fact that Louisa had a living *133 husband, the law would have declared their status to be that of a common-law marriage. ... The death of George Brown (in November, 1925) made no change in their relations. They made no new contract in relation thereto, but from October, 1925, when they reunited their lives in the city of Beaumont, Tex., there was no change in their relations until Joe's death in January, 1926."
 Upon these facts the court held that the law would infer that consent had been given by the parties to the marriage as soon as the impediment to it was removed, although they did not know that the impediment had been removed, i.e., by the death of Brown. The court goes on to say: "As they desired marriage, and intended their relations to be that of husband and wife, this continuing intent must be recognized during all the time they cohabited as such, and therefore the agreement upon which they renewed their relations made them husband and wife from the moment the bar to their lawful marriage was removed."
 From the quotations of the foregoing case it appears to be the view of the court that where the contract of marriage is invalid under the law in the state in which it is made, the status of the parties thereafter will be regarded as being meretricious and that that status will follow them during any stay in Texas, unless there is a new agreement of marriage made in Texas, followed by cohabitation and a public holding-out or unless they become domiciled in Texas. If the parties become domiciled in Texas, then and in that event there is no necessity to prove a new agreement of marriage in Texas, but instead consent to a new marriage within that state will be inferred by reason of the original intent to marry if there be cohabitation in Texas and a public holding-out by the parties that they are husband and wife. In short, domicile is an aid but not a prerequisite to sustain the claim of a common-law marriage in Texas where the original contract of marriage was invalid. We have no such case here.
 [2] In this case it is true, as appellant contends, that certain statements were made by Edwin in his lifetime which tended to put in question the validity of the marriage. These statements, however, we regard as being equivocal. At all events, it was for the trial court to weigh the evidence and determine the credibility of the witnesses.
 [3] The contention that the trial court erred in admitting Nancy's testimony as to transactions and conversations with Edwin is without merit. The law of California in that aspect *134 was applicable and not that of Texas. (Estate of McCausland, 52 Cal. 568.)
 As we are satisfied that the law of Texas is as we have stated it, we see no point in discussing or differentiating the numerous additional cases cited to us.
 The orders are affirmed.
 Doran, Acting P. J., and Drapeau, J., concurred.