[Crim. No. 1114.   Fourth Dist.   Dec. 12, 1956.]

THE PEOPLE, Respondent, v. CHARLES M. HEAD, Appellant.

George H. Sullivan and Julien R. Bauer for Appellant.

Edmund G. Brown, Attorney General, and William E. James, Deputy Attorney General, for Respondent.

MUSSELL, J.—Defendant was charged with the crime of permitting his wife to remain in a house of prostitution (violation of Pen. Code, § 266g). The information further alleged that defendant had twice previously been convicted of felonies, to wit, the crimes of robbery and larceny from person and that he had served terms of imprisonment in state prisons for said convictions. A jury returned a verdict finding him guilty of the crime of permitting his wife to remain in a house of prostitution, as charged in the information, and he was sentenced to imprisonment in the state prison

for the term prescribed by law. Defendant admitted the two prior felony convictions, as alleged, and appeals from the judgment of conviction.

Defendant owned and operated a shoe-shining stand in Barstow, in San Bernardino county, and was also employed as a janitor. He and his wife, Clara, lived in a two-room house in an area known as "River Bottom." On May 14, 1955, at about 2 a. m., one John Bevard, a member of the military police, dressed in civilian clothes, met the defendant in front of the Jack Frost Café, near the defendant's house. Defendant asked Bevard if "he wanted to get with it for the night." Bevard indicated that he did not particularly care and, after further conversation, Bevard walked with defendant to defendant's house, nearby, and as they went past, the defendant knocked on the side of the cabin and asked if the room was empty. Bevard heard a woman inside reply but did not know what she said. The two men then went around in back into a small closed-in porch, set down and started "talking over the price." A dog started barking outside and defendant jumped up, turned the light off, opened the door into the front room of the house, and yelled that the police were outside. Defendant shoved Bevard into the front room, where defendant's wife was "getting dressed" and a man, named Stewart, was putting on his trousers. Defendant ordered Stewart to get under the bed, pushed Bevard down on the bed and told him to lie there as if he were asleep. Two deputies from the sheriff's office, Webb and Moore, then knocked on the door and, when no one answered, they forced it open and entered. Defendant's wife was dressed at that time and Stewart was under the bed. Defendant said, "This is my home and this is my wife; what are you doing here?" The defendant was then taken to the police station.

Officer Webb testified that he told the defendant he had heard rumors that the defendant had said he could do anything he wanted because they were too dumb to catch him; that when asked if he had made such a statement, defendant said, "Well, let's stop harping on it, I know I done wrong and I got caught. I am not mad." Webb further testified that for three or four evenings before the morning of the arrest they had that cabin under observation and had observed the premises with a pair of seven fifty coated lens night glasses; that on the three nights immediately before the night of the 13th of May, he had seen Charles Head; that Head was seen standing in front of the Jack Frost Café four or five

times and was observed approaching Marines and soldiers, talking to them and taking them to his house; that he had seen approximately 10 men going with Head to this house.

Officer Moore testified that when he entered defendant's house, he got defendant's wife out of bed; that she was lying on the bed in the small room, fully clothed, and with her face to the wall, "like she was asleep"; that he took the defendant and his wife outside and later returned to the room, where he found Stewart under the bed; that he heard Officer Webb talking to the defendant at the police station and heard the defendant say, "Yeah, I got caught. I am not mad at you guys. I wish I had a half a dozen girls down there."

The defendant, when arrested, had approximately $150 on his person and an additional $200 in bills, which, he testified, he had in his shoe. When he was asked about it, he said he got it shining shoes.

Stewart testified that in the early morning hours of May 14th he was in the vicinity known as the "River Bottom" and had been drinking at the café; that he started home in his car at about 2 a. m. and that as he drove along the street, a colored lady "hollered" at him and he stopped his car; that he went with the woman into the house and gave her $4.00; that she was then fully dressed and that she partially disrobed after receiving the money; that he heard a voice saying "Is the room vacant or open?"; that the lady said, "Just a minute," and closed the door; that he heard voices coming from the other room and the officers entered; that he had gotten under the bed because he was ashamed and embarrassed.

A member of the Marine Corps at Barstow, identified People's Exhibit Four (a photograph of defendant's wife) as a picture of the woman with whom he had intercourse in the early part of May, 1955. He testified that he had given her $5.00 and identified the defendant's residence as the place where the act of intercourse had taken place. Two other Marines testified as to similar acts with the defendant's wife, consummated at the same house during May, 1955, and each testified that he paid defendant's wife the sum of $5.00.

A certified copy of a marriage certificate, showing the marriage of the defendant to Clara Luzetta Durant (the woman living with defendant at the time of his arrest), was received in evidence as proof of defendant's marriage to her on June 23, 1952.

The defendant testified that on May 14, 1955, he owned and

operated a shoe-shining stand in Barstow; that the shack shown in People's Exhibit Two was where he was staying at the time and that People's Exhibit Four was a photograph of the woman who was staying with him; that he did not know of the prostitution activities of Mrs. Head; that he and his wife had been on the "outs" and that he had stayed in one room of the house, while she stayed in the other; that he met his wife in 1950 in Texas; that she was then living with a man named Young and that he did not know whether Young had obtained a divorce from her or not. He admitted that he had married Clara, as shown by the certified copy of the marriage certificate in evidence, and admitted meeting the witness Bevard on the morning of May 14th. He stated that as they went by the house involved, he (Head) tapped on the window and asked if anybody was home. He testified that they then went into the house, that a dog started to bark, and he saw two officers outside, and that he did not know that the witness Stewart was in the house.

The foregoing evidence amply supports the verdict of the jury finding the defendant guilty of the crime of permitting his wife to remain in a house of prostitution, as alleged.

██ Prostitution is defined to be the common, indiscriminate, illicit intercourse of a woman for hire, and a house of prostitution is one in which the prostitute plies her trade. (*People* v. *Mitchell,* 91 Cal.App.2d 214, 217 [205 P.2d 101].) ██ A prostitute is a woman who offers herself indiscriminately to sexual intercourse for hire. (*People* v. *Phillips,* 70 Cal.App.2d 449, 452 [160 P.2d 872].)

██ There was substantial evidence that Clara Head was the wife of the defendant. This was shown by a certified copy of the marriage certificate, by the statements of the defendant to the officers that she was his wife, and by his testimony at the trial. There was competent testimony that defendant's wife commited indiscriminate and illicit acts of intercourse on the premises involved. The evidence shows that the defendant not only knew of the activities which were being carried on by his wife in the house, but that he actively engaged in assisting her by procuring customers for her and warning her of the police officers. ██ Moreover, his consent may be inferred from the evidence of his failure to object to his wife's activities. (*People* v. *Bosquet,* 116 Cal. 75, 78 [47 P. 879].)

██ Defendant first contends that the conviction must be reversed because he claims that the proof shows that the defendant was not legally married. This contention has no

merit. The proof relied upon in this connection consisted of the testimony of the defendant that Clara and one Herman Young were living together in Texas and held themselves out to be married; that she was known as Mrs. Young; that she introduced herself as Mrs. Young, and Mr. Young introduced her as Mrs. Young, and that she and Young resided together as husband and wife. Appellant argues that this evidence was not contradicted and was sufficient to prove that a common-law marriage existed under the law of Texas. In this connection he cites *Estate of McKanna*, 106 Cal.App. 2d 126, 129 [234 P.2d 673], where it is pointed out that a common law marriage is valid in Texas and that there are but three essentials therefor; the first being a mutual consent which "need not be expressed or evidenced by any particular form or words"; the second being that "the parties cohabit together as man and wife"; and the third that "the parties hold themselves out as man and wife"; that under the evidence and the authority of *People* v. *Mock Yick Gar*, 14 Cal.App. 334 [111 P. 1039], a conviction for violation of section 266g of the Penal Code could not be sustained. In that case the judgment of conviction under Penal Code, section 266g, was reversed where the uncontradicted testimony of the defendant and his uncle was that the defendant had previously been married to a Chinese woman in China in 1897; that they had lived together as husband and wife; and that a child was born to them; that the woman was still living; that he had never been divorced from her, and since his return to the United States he had sent her support all the time; that ever since the ceremony was performed he had treated her as his lawful wife. In a concurring opinion, Presiding Justice Cooper stated that in his opinion the testimony of the prosecutrix was such that it was extremely doubtful if it would support the verdict. However, in the instant case the only testimony relied upon by appellant in support of his contention is his own, and the jury was not bound to believe it. His credibility was impeached by proof of his two prior felony convictions; by his testimony that he lived with Clara as man and wife; that she represented herself as Mrs. Head and he introduced her to persons in the community as Mrs. Head. It further appears that when the officers entered defendant's house on May 14, 1955, his first words were "This is my home and this is my wife; what are you doing here." It also appears from the certificate of marriage in evidence that the defendant was not then claiming that Clara was married to Young.

In *People* v. *Menne,* 4 Cal.App.2d 91, 107 [41 P.2d 383], the court said:

"It is further contended that the testimony of the defendant in the particulars where it was uncontradicted should have been accepted by the jury as a truthful statement of the facts, basing the argument upon the case of *People* v. *Mock Yick Gar,* 14 Cal.App. 334 [111 Pac. 1039]. In making this contention appellant overlooks or disregards the testimony to the effect that the reputation of the defendant was such as to render his statements unworthy of belief. In the face of such testimony it was within the province of the jury to determine what credence should be given to the testimony of the defendant, and whether they should accept as truthful any part of his testimony."

And as is said in *Lohman* v. *Lohman,* 29 Cal.2d 144, 149 [173 P.2d 657] : ". . . a trial judge is not required to accept as true the sworn testimony of a witness, even in the absence of evidence directly contradicting it. . . ."

In the instant case we cannot say as a matter of law that the testimony of the defendant was uncontradicted and it clearly appears that there were substantial reasons to support its rejection by the jury.

■ The next contention of appellant is that where a wife engages in acts of prostitution in the residence occupied by her and her husband, the husband cannot be convicted of allowing or permitting his wife to remain in a house of prostitution. In this connection appellant cites section 157 of the Civil Code, which provides that "Neither husband nor wife has any interest in the property of the other, but neither can be excluded from the other's dwelling." Appellant argues that he could not exclude his wife from their family residence even though she may have engaged in acts of prostitution there, with or without his consent. However, appellant overlooks the evidence that he actively participated in maintaining the house involved as a house of prostitution. He procured customers, conducted them to the place, and evidently shared in the proceeds obtained from the illicit business conducted therein.

■ The trial court instructed the jury that neither a husband nor wife can be excluded from the other's dwelling and that "if you find from the evidence that the defendant and Clara Head were husband and wife and were the sole occupants of the same, and that the wife resorted to acts of prostitution therein without the knowledge of the defendant

husband, you should acquit the defendant.'' The defendant testified that when he found out about Clara's activities in the house with another girl and three or four soldiers, ''I snatched her out of there and I whupped her about it.'' In this connection the court instructed the jury as follows: ''In the event you find that Clara Head was defendant's wife and that she was in a house of prostitution, the defendant may avoid the penalty of the law by showing that he has in good faith used all lawful means to cause the removal of his wife from the house of prostitution, or, that he was anxious to have her leave and tried in all reasonable ways to induce her to do so.'' Appellant contends that these instructions were confusing in that ''On the one hand the court instructed the jury that the defendant could be acquitted if he tried to evict his wife from their residence, and on the other hand instructed the jury that he could not do so.'' We are not in accord with this contention. There is no apparent conflict in the criticized instructions, for the jury was instructed concerning eviction from a residence by one spouse, and it was also told that the defendant could avoid the penalty of the law if he used in good faith all lawful means to have her leave and tried in all reasonable ways to induce her to do so. It is clear that the instructions do not constitute ''a direction to return a verdict of guilty'' as is contended by the appellant.

Finally, it is argued that ''Where defendant has made no confession or admissions concerning the crime with which he is charged, it is reversible error for the trial court to instruct the jury that a confession or admissions have been made.'' This contention is likewise without merit. The trial court told the jury that ''Evidence has been received in this case *tending* to show that on another occasion other than this trial the defendant made a statement *tending* to prove his guilt of the alleged crime for which he is on trial.'' (Italics ours.) The court then instructed the jury that such a statement might be either a confession or admission and proceeded to define both. In this connection the court further instructed the jury that ''The law of this state admonishes you to view with caution the testimony of any witness which purports to relate an oral admission of the defendant or an oral confession by him.'' These instructions were proper as there was testimony of statements tending to show guilt made to the witness Bevard and to the officers who made the arrest. Defendant stated to Officer Webb that he knew

he had done wrong and got caught and made the following statement to Officer Moore: "Yes, I got caught. I am not mad at you guys. I wish I had a half a dozen girls down there." We conclude that there was ample evidence of the guilt of defendant to support the judgment and that the court did not err in instructing the jury.

Defendant states in his notice that he appeals from the order denying his motion for a new trial. However, such a motion was not made and there was, therefore, no order denying his motion. The attempted appeal therefrom is therefore dismissed.

The judgment is affirmed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied December 21, 1956, and appellant's petition for a hearing by the Supreme Court was denied January 7, 1957.