[Crim. No. 6750.   Second Dist., Div. One.   Dec. 29, 1959.]

THE PEOPLE, Respondent, v. RUSSELL GUY COURTNEY et al., Appellants.

Morris Lavine for Appellants.

Stanley Mosk, Attorney General, and Elizabeth Miller, Deputy Attorney General, for Respondent.

FOURT, J.—This is an appeal by Russell Guy Courtney from a judgment wherein he was convicted of pimping and pandering and an appeal by Ardella M. Courtney from a judgment wherein she was convicted of pimping.

In an information filed in Los Angeles County, the defendants were charged with pimping and pandering in violation of sections 266h and 266i of the Penal Code. A jury found Ardella M. Courtney (hereinafter referred to as the woman appellant) guilty of pimping as charged in Count I and Russell Guy Courtney (hereinafter referred to as the man appellant) guilty of pimping and pandering as charged.

A résumé of the facts is as follows:

The man appellant first met Wanda Lee Pownall (hereinafter referred to as the victim), a telephone operator, at a bar club in about 1953. He met the victim again in 1958 at another bar club. Upon leaving the latter bar the man appellant and victim went to a motel where they spent the night and engaged in sexual relations. The man appellant took the victim to her apartment about 3 p. m. the next afternoon. That evening the man appellant pushed his way into the victim's apartment where she and a girl friend were about to retire. The three of them stayed up all night and during the visit he struck the victim. The victim saw the man appellant about a dozen times before September 1, 1958, and during all such occasions he stated to her that she should be a prostitute for him, that she could make more money than she was then making and could take life easy.

About September 1, 1958, the man appellant came to the home of the mother of the victim where the victim had recently moved. The mother invited the man appellant into the house and gave him the telephone number where the victim could be reached. He called the victim and advised her to come home. The man appellant had told the victim that he would disfigure her, as well as her mother if she did not do what he demanded. The victim came home and met the man appellant outside of the mother's house. He told her that he was going to take her to a bar to meet a man and that he needed money. She started into the house and he grabbed her and placed her in the back seat of an automobile driven by a Mr. Anderson. A Mona Poulson was seated next to Anderson. The car was driven to a bar and they went inside and ordered drinks.

At the bar the man appellant told the victim that since she would not go with the person whom he had in mind and make some money that he would settle for her paycheck because

he did not have enough money with him to pay the bar bill. She signed her check and delivered the same to the man appellant.

The group left the bar about 1:30 a. m. September 2, 1958, and went to a motel in North Hollywood. The man appellant engaged a single room and all four entered. In the room the man appellant forced Miss Poulson to undress and he tore the victim's dress from her. He demanded that the two women lie on the bed and engage in homosexual relations. Miss Poulson became sick. Anderson left. The man appellant attempted to have sexual intercourse with the victim after striking her. He hit Miss Poulson with his fists when she moaned. At about 4 or 4:30 a. m. September 2, 1958, the man appellant and the victim dressed and carried Miss Poulson to the car and all of them then drove to his apartment.

The man appellant told the victim that she was going to spend the day there, that she was not going home again. He also told her that he had some prostitutes working at his apartment and that Ardella Courtney (the woman appellant), whom he introduced as Marilyn Anderson was one of the prostitutes working for him. The woman appellant was in a bedroom on the bed. Miss Poulson was placed on a couch and the man appellant and the victim got into bed with the woman appellant where he engaged in intercourse and oral copulation with each of them until about 7 a. m.

The woman appellant left the apartment about noon and the man appellant and victim remained in bed until about 5 p. m. He told her that she was going to be a prostitute for him, that they were going to make a lot of money together; that she would not think it was so bad after she got used to it; that it was an easy way to make a living; and that he had been making his living off of women of such types for quite some time.

The woman appellant returned to the apartment and made a telephone call. The victim overheard a conversation between the woman appellant and Miss Poulson with reference to a date they had made for the victim between 5 and 5:30 o'clock and wherein it was stated that the person she was to meet would be all right to break her into prostitution. The man appellant entered the bedroom and told the victim to take a shower and to put on some makeup, that she had a date arriving shortly. He stated to her that she was going to be a prostitute and there was nothing she could do about it. A male person by the name of "Mannie" arrived and the man

appellant attempted to convince the victim that she should engage in sexual intercourse with "Mannie." The victim at first refused and then was struck by the man appellant. The man appellant hid in a closet close by and Miss Poulson entered the bedroom and introduced "Mannie" to the victim. They engaged in sexual intercourse and "Mannie" left $20 on the dresser and departed. The man appellant came out of the closet laughing, picked up the $20 and said, "Now, that wasn't so bad, was it?" The victim never saw the $20 again.

About 10 p. m. of that same evening the man appellant told the victim to get dressed that he was taking her to a date. The man appellant left the room and the woman appellant told the victim that when she went to the date's apartment she was not to ask for any money before or after, that the man she was going to see would give her the money which would be about $35.

The man appellant drove the victim to her mother's house for a change of clothes. The mother noticed that there was a big bruise on the side of the face of her daughter, that her ear was swollen and there were fingermark bruises on each of her arms. The man appellant then drove the victim to an apartment house, pointed out an apartment and directed the victim to enter. The victim walked into the apartment, where she engaged in an act of sexual intercourse with the person who occupied the apartment and he gave her some folded currency. The victim dressed, departed and gave the money to the man appellant. The man appellant and the victim returned to his apartment where they and Miss Poulson slept on the bed in the bedroom.

About 3 p. m. the next day, September 3, 1958, the victim heard the woman appellant make several telephone calls, one of which was to a hotel in Beverly Hills where a male person was paged and a date made for such person and the woman appellant for around 10 that evening. Another call was made to another hotel by the woman appellant and a date was made for around 2 a. m.

The man appellant, having gone out, returned and stated that the woman appellant and Miss Poulson were going to Las Vegas. The woman appellant stated that she had made dates and that something would have to be done about it. The man appellant suggested that the victim assume the engagements which had been made by the woman appellant. The woman appellant placed three telephone calls during one of which the victim overheard the woman appellant give a fair

description of the victim and there then followed a discussion of price and an agreement thereon. The woman appellant wrote out a notation, "Morrie Friedman, Cr. 47727, Room 524" on a piece of paper and handed it to the man appellant who gave it to the victim after he had written thereon "call 2:15 or 2:30."

The man appellant drove the woman appellant and Miss Poulson to the airport where the two women took an airplane to Las Vegas. The man appellant then took the victim to a club in Beverly Hills to meet the person with whom a date had been made. That person did not make his appearance and the man appellant drove the victim to the Beverly Hills Hotel.

The man appellant instructed the victim to collect $50 from the man she was to meet at the Beverly Hills Hotel and then to call another hotel. The man appellant left the victim at the Beverly Hills Hotel and departed. She waited in the lobby of the hotel for 15 or 20 minutes and then left.

The man appellant called the victim at her home the next day, September 4, 1958, and stated that he calculated that she should have over $200 and he wanted and needed the money. She stated that she did not have the money, that she did not "turn the tricks at all" and he thereupon referred to her as a liar.

On September 5, 1958, the man appellant called the victim at her telephone service job and told her in effect that even though she had not engaged in sexual intercourse with the persons arranged for, he could have, but for her, sent someone else who could have made the money and that therefore she was obligated to him to pay the money in any event. He told her that he would not kill her but that he would mark her up rather badly.

The victim had arranged through her employer at the telephone service office to have payment stopped on the check which she had given to the man appellant some days previously. The man appellant told her that she had thereby put him in an embarrassing position by stopping payment on the check because he had cashed it with a friend who wanted his money. The man appellant told the victim that if she knew what was good for her that she would meet him and pay him the money. During the conversation, the victim asked another telephone operator to plug in on the line and to listen to the conversation. The second operator recognized

the voice of the man appellant and heard him claim to the victim that she, the victim, owed him $200, that she was supposed to "turn tricks for him," that he knew friends who would find out if she was lying and that it would make a good Christmas present to find her crippled in an alleyway. He further stated that he wanted to see her that night and "that she had better keep the appointment or else."

An officer of the vice squad testified that in most cases a prostitute will have two "trick books" so that if arrested and released on bail she will be able to continue her business. Two substantially identical phone number books similar to "trick books," with names and numbers in the handwriting of the woman appellant were in the appellant's apartment during the first week of September, 1958.

Appellants contend: (1) that the evidence was insufficient as to the man appellant as to each of the counts; (2) that the evidence was insufficient as to the woman appellant because, among other things, the evidence did not show that she was a "male person" as set forth in the statute; (3) that the court erred in the admission and exclusion of certain evidence; and (4) that the court erred in the giving of certain instructions.

The man appellant in this case insists that there is no evidence to the effect that he caused, induced, persuaded or procured the victim to become an inmate of a house of prostitution or to enter any place where prostitution is encouraged or allowed. Section 266i of the Penal Code reads in part as follows:

"Any person who: (a) procures a female inmate for a house of prostitution; or (b) by promises, threats, violence, or by any device or scheme, causes, induces, persuades or encourages a female person to become an inmate of a house of prostitution; or (c) procures for a female person a place as inmate in a house of prostitution or as an inmate *of any place in* which prostitution is encouraged or allowed within this State; or (d) by promises, threats, violence or by any device or scheme, causes, induces, persuades or encourages an inmate of a house of prostitution, or any other place in which prostitution is encouraged or allowed, to remain therein as an inmate; . . . is guilty of pandering, a felony."

The statute encompasses any place where prostitution is encouraged or allowed, even if the place be a taxicab. (*People* v. *Nasworthy*, 94 Cal.App.2d 85, 91 [210 P.2d 83].)

"Pandering is established when the evidence shows that

the accused has succeeded in inducing his victim to become an inmate of a house of prostitution." (*People* v. *Mitchell*, 91 Cal.App.2d 214, 217 [3] [205 P.2d 101].)

██ "Prostitution means common, indiscriminate, illicit intercourse for hire. It is the practice by a female in offering her body to an indiscriminate intercourse with men for money or its equivalent. . . ." (*People* v. *Marron*, 140 Cal.App. 432, 434 [35 P.2d 610].) It is also set forth in the Marron case that a house of ill fame may be a flatboat with a cabin on it, a tent, one room of a steamship or a single room and that a house of ill fame is synonymous with a house of prostitution.

We have heretofore related the revolting evidence and no useful purpose would be served in calling attention to specific portions thereof. Suffice it to say that the evidence does show that the man appellant encouraged and allowed the victim to perform an act of intercourse with a person ("Mannie") for $20 at the man appellant's apartment and that the man appellant transported the victim to another apartment where she performed a second act of prostitution for money and gave such money to the man appellant.

██ Appellants assert that the testimony of the victim is not to be believed and that it "bears the marks of such improbability as to challenge the credulity of any normal person." "The only bases for the total rejection of any testimony are (1) its apparent falsity without resorting to inference or deduction, or (2) its physical impossibility." (*People* v. *Mitchell*, *supra* [91 Cal.App.2d 214], at 220.) We find neither of the bases above mentioned in this case. It may be that the story which the victim related was weird, exceptional and out of the ordinary, but that does not necessarily make it fit either one of the categories above mentioned. The victim was a competent witness by the very terms of the statute which was involved in this case. The trier of fact believed a substantial part of the testimony of the victim and under the circumstances, we believe that the man appellant's claim that the evidence was insufficient is without merit.

The man appellant also asserts that there is no evidence to the effect that the victim was a prostitute or that she sought money as a prostitute and that there is insufficient evidence to support a judgment of conviction of pimping on his part. He indicates too that he was gainfully employed. ██ However, gainful employment is not a defense to either of the accused. (*People* v. *Jackson*, 128 Cal.App.2d 506, 509 [275

P.2d 802].) ▮ The evidence has heretofore been set forth at some length and it is clear therefrom that the male appellant knew of the prostitution of the victim and even on one occasion hid in a closet close by while the victim engaged in an act of intercourse and immediately thereafter took the money which had been paid to the victim for such act.

▮ The prosecution can establish that the accused lived and derived support and maintenance from the earnings of the prostitute without proving that the particular money received from a particular act was expended for that purpose. (*People* v. *Giambone,* 119 Cal.App.2d 338, 340 [259 P.2d 10].) It can be inferred from the testimony that the man appellant had spent the money which the victim earned on the night of September 2, 1958. He stated that she owed him $200 and further that he needed the money. She stated that she did not have the money, that she did not "turn the tricks at all." The testimony shows clearly that the man appellant claimed that the victim was obligated to pay money to him. Furthermore, the testimony of the victim was corroborated by her coworker in the telephone service.

▮ In this case the man appellant transported the victim to his apartment and thereafter to another apartment in each of which the victim committed acts of prostitution. The man appellant in each instance took the money proceeds of the acts of prostitution. In our opinion the evidence was amply sufficient to support the conviction of the man appellant of pimping.

▮ The woman appellant insists that because section 266h of the Penal Code described pimping in terms of "any male person" that therefore it necessarily follows that no female person can be convicted of pimping. The contrary was established in *People* v. *Young,* 132 Cal.App. 770, 772 [23 P.2d 524]. ▮ The penal statutes are to be construed according to the fair import of their terms with a view to effect its objects and to promote justice. The rule of the common law that penal statutes are to be strictly construed has no application to the Penal Code. (Pen. Code, § 4.)

▮ It was appropriately said in *In re Davis,* 18 Cal. App.2d 291, 295 [63 P.2d 853]:

". . . the courts are (not) always to be governed by the exact phraseology and literal meaning of every word or phrase employed. The primary rule of intention is to be first applied. . . . In other words, the courts will not blindly follow the letter of a law, when its purpose is apparent, to consequences

which are inconsistent with that purpose; and this would seem to be particularly true when the results of a literal interpretation, if adopted, would be absurd, and unjust, and where rights of the public are involved. . . . A thing which is within the intention is as much within the statute as if it were within the letter, . . .''

Section 266h (pimping) and 266i (pandering) were enacted by the same Legislature and should be treated together. (*People* v. *Jackson*, 30 Cal. 427.) In adopting the section making pandering a crime, the Legislature undoubtedly had in mind to discourage the nefarious business of replenishing houses of prostitution with inmates. (*People* v. *Cimar*, 127 Cal.App. 9, 11-14 [15 P.2d 166, 16 P.2d 139].) Certainly, pimping is equally nefarious. The object of the section is to stop such course of conduct and to discourage prostitution, and justice would seem to dictate that anyone, whether male or female, acting as a pimp should be punished.

The woman appellant further contends that as a female may not directly be charged as a pimp, neither may a female be indirectly prosecuted under section 31 of the Penal Code for taking part in the commission of the crime by a male. Section 31 of the Penal Code reads in part as follows:

''All persons concerned in the commission of a crime, whether it be felony or misdemeanor, and whether they . . . aid and abet in its commission, or, not being present, have advised and encouraged its commission . . . are principals in any crime so committed.'' (Enacted 1872.)

The Young case, *supra* (132 Cal.App. 770), was determined in 1933. Thirteen (13) regular sessions of the Legislature have convened since that case and the Legislature has never seen fit to change the law. Where a statute has been judicially construed and that construction has not been altered by subsequent legislation it can be presumed that the Legislature is aware of the judicial construction and approved of it. (*People* v. *Hallner*, 43 Cal.2d 715, 719 [277 P.2d 393]; *People* v. *Wein*, 50 Cal.2d 383, 400 [326 P.2d 457].)

As to the woman appellant's claim that the evidence was insufficient as to her, suffice it to say that it is sufficient if she knew the intention of the man appellant and either by acts, words, or gestures *aided* or encouraged the commission of the crime. (*People* v. *Lewis*, 113 Cal.App.2d 468, 470 [248 P.2d 461].) We have heretofore related what the woman appellant did in this connection and it is fully shown that she had knowledge that the victim was to perform acts of prostitution,

that the victim was instructed by the woman appellant about getting the money for such acts of prostitution, that the woman appellant knew that the man appellant, her husband, was to receive money for the victim's acts of prostitution and that she aided him in the nefarious business of arranging, over the telephone, assignments for the victim.

The appellants contend too that the court erred in limiting cross-examination of the victim.  ▉  Where a witness upon cross-examination states that he cannot remember and admits that his recollection was fresher on the subject at the preliminary hearing, his evidence given at that examination is not admissible as impeaching or contradictory evidence and is properly rejected as immaterial. (*People* v. *Dice,* 120 Cal. 189, 201 [52 P. 477].) Had counsel for the appellants wanted the former testimony he could have followed the procedure with reference to the refreshing of the memory of a witness. (See Fricke, California Criminal Evidence, § 189.)

▉  The appellants in the present case apparently attempted to have a witness testify as to the reasons for some of the discrepancies which occurred. The reason is not necessarily important and it is the fact of the discrepancy which impeaches.

We have read the entire record in this case and in our opinion there was no error in the rulings of the trial court. The cross-examination was complete and comprehensive and was not unduly limited.

▉  The effort of appellants to show that one of the prosecution's witnesses had a bad reputation by showing specific wrongful acts was improper and the trial judge properly refused to permit such questions.

▉  The instructions complained of by the appellants are not before this court and we therefore assume in support of the judgment that the jury was properly instructed. (See *People* v. *Tate,* 124 Cal.App. 48, 51 [12 P.2d 109].)

The orders and the judgment and each of them is affirmed.

Wood, P. J., and Lillie, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied February 24, 1960.