[Crim. No. 5113. First Dist., Div. One. Dec. 17, 1965.]

THE PEOPLE, Plaintiff and Respondent, v. LORI SCHULTZ, Defendant and Appellant.

Kenneth C. Zwerin for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Edward P. O'Brien and Horace Wheatley, Deputy Attorneys General, for Plaintiff and Respondent.

MOLINARI, J.—On this appeal from the judgment of conviction for violating Penal Code section 266[1] (pandering), defendant, Lori Schultz (also known as Shirley Schultz), raises a number of issues. The facts pertinent to each of these issues will be discussed in our consideration of the separate issues.

*The Jurisdiction of the Court at the Time of Judgment to Correct the Error Which it Made in Previously Stating That it Found Defendant Guilty of Violating Section 266h Instead of Section 266i*

By grand jury indictment defendant and Gilbert Schultz were charged with three felonies: Count one of the indictment contained a charge of conspiracy (violation of § 182), count two a charge of pandering (violation of § 266i), and count three a charge of pimping (violation of § 266h). Trial by jury was waived and the matter was heard before the court without a jury. At the conclusion of the trial the court indicated that it found Gilbert Schultz not guilty on all counts. It then stated that as to defendant ''there could be no guilt as to the pimping charge under the evidence. . . . So, that leaves only the pandering charge.'' Subsequently, at the continued hearing, after argument by the attorneys, the court indicated its findings as follows: ''. . . I am convinced beyond a reasonable doubt that the defendant is guilty of the charge of pandering. I can come to no other conclusion. So, the Court finds the defendant not guilty as to Count One, alleging a conspiracy, not guilty as to Count Two, charging pimping, and the Court finds the defendant guilty as charged as to the crime of pandering, a violation of Section 266h of the Penal Code as charged in Count Three.''

The matter was then continued for a hearing on defendant's motion for probation and for pronouncement of judgment. At this continued hearing, which was held some eight weeks later, the court became aware of the fact that it had previously announced a conviction of defendant for a violation of section 266h as charged in count three of the indictment and found her not guilty of a violation of section 266i as charged in count two. The error was declared by the court to be clerical, whereupon the trial judge announced that the records of the court were corrected to read that defendant was found guilty of violating section 266i, i.e., the crime of

---

[1]Unless otherwise indicated, all statutory references are to the Penal Code.

pandering as set out in count two of the indictment, and not guilty as to counts one and three.[2] The trial court then proceeded to pronounce judgment. The minutes of these proceedings do not reflect the subject correction but they do indicate that defendant having been found guilty of violating section 266i judgment and sentence therefor were pronounced by the court.

In relation to this action taken by the trial court defendant now argues on appeal that "The court, having found appellant not guilty of pandering, lacked jurisdiction, after the entry of this judgment, to set it aside and sentence appellant on this count [count two]."[3] ▮ In considering this contention, we note initially that a court, in criminal as well as civil cases, has inherent power to correct clerical errors in its records at any time so as to make these records reflect the true facts. (*People* v. *Flores,* 177 Cal.App.2d 610, 613 [2 Cal.Rptr. 363]; *People* v. *Bueno,* 177 Cal.App.2d 235, 238 [2

[2]The verbatim statements of the court were as follows: "THE COURT: All right, in this matter, gentlemen, on my review of the records, it appears when this matter was submitted for decision by the Court on December 2nd, 1964, the Court announced or had announced that clearly the defendant could not be guilty of the crime of pimping, because pimping was a crime that could be committed only by a male person except under circumstances which don't exist here, a situation of aiding and abetting, and the matter was submitted for—and the Court indicated that the defendant in his opinion was clearly guilty of pandering. In announcing the decision of the Court, however, the Court found the defendant not guilty—apparently from the record—found the defendant not guilty of Counts One and Two and found the defendant guilty as to Count Three which clearly was, and the Court now declares it, to be in the nature of a clerical error made by the Court. MR. ZWERIN: Count Three is the pimping count? THE COURT: The intent of the Court was at the time to convict her of pandering and not pimping. So, the record of the Court is now corrected to read that the Court finds the defendant guilty of the crime of violation of Section 266i, the crime of pandering as set forth in Count Two of the indictment, and this finding of guilty was the intention of the Court at the time on December 2nd, to find her —to state that the Court found her guilty of the violation of Section 266i, and the Court did in fact find her guilty of a violation of Section 266i of the Penal Code at that time, and Count One, the count of conspiracy, as to Count One the count of conspiracy, and Count Three, the count involving pimping, the Court finds the defendant and the record will now show that the Court on December 2nd found the defendant to be not guilty as to Count One and Count Three."

[3]Although not relevant to our decision on this issue, we note that defendant has erroneously characterized the trial court's findings as the judgment. Whereas the court's initial findings constitute "A conviction . . . which precedes the judgment or sentence of the court" (*In re Anderson,* 34 Cal.App.2d 48, 50 [92 P.2d 1020]), the judgment in a criminal action is the sentence (*People* v. *Perkins,* 147 Cal.App.2d 793, 797 [305 P.2d 932]; *People* v. *Tokich,* 128 Cal.App.2d 515, 519 [275 P.2d 816]). Accordingly, the error was made and corrected *prior to* the entry of judgment and not, as defendant states, after such entry.

Cal.Rptr. 62] ; *In re Roberts,* 200 Cal.App.2d 95, 97 [19 Cal. Rptr. 147].) This rule allowing correction of clerical error, whether made by the clerk, counsel, or the court itself, is to be distinguished from the situation involving judicial error, which can only be corrected by appropriate statutory procedure. (*Lankton* v. *Superior Court,* 5 Cal.2d 694, 696 [55 P.2d 1170] ; *Estate of Burnett,* 11 Cal.2d 259, 262 [79 P.2d. 89] ; *Maxwell* v. *Perkins,* 116 Cal.App.2d 752, 755 [255 P.2d 10] ; *People* v. *Papayanis,* 101 Cal.App.2d Supp. 918, 920 [226 P.2d 91].) The distinction between clerical error and judicial error is that the former is inadvertently made while the latter is made advertently as the result of the exercise of judgment. (*Lankton* v. *Superior Court, supra,* p. 696; *Allen* v. *Allen,* 138 Cal.App.2d 706, 711 [292 P.2d 581] ; *Uhl* v. *Johnson,* 141 Cal.App.2d 659, 665 [297 P.2d 493].)

 In the instant case, as is clear from the trial court's discussion as to defendant's guilt on the pandering charge and her innocence on the pimping charge, the error which it made in finding defendant guilty of a violation of section 266h as charged in count three of the indictment—in reality the pimping charge—and finding her innocent as to count two, which charged a violation of section 266i—in reality the pandering charge—was patently an inadvertent error. Such findings were obviously contrary to the intention of the court, as it in fact indicated at the time of entering judgment, and accordingly, as discussed above, the court possessed inherent power to correct its clerical error.

### The Legality of the Search of Defendant's Apartment

 A second issue which defendant raises on appeal concerns the admissibility into evidence of certain objects which were found by the police in defendant's apartment at the time of her arrest. In particular defendant urges that the police lacked probable cause to arrest defendant and consequently that the search which they conducted incident to this arrest was illegal. The evidence upon which the trial court concluded that the arrest and search were legal consisted solely of the testimony of Officer Checchi, who was with the Prostitution Detail of the Bureau of Special Services of the San Francisco Police Department. He testified as follows: At about midnight on July 30, 1964 he was called to the Fairmont Hotel to investigate alleged prostitution activities. At the hotel, he and his partner, Officer White, followed two girls, one the prosecution's witness, Nancy Slater, to room 2202, where they overheard the occupant of that room ask the

girls to "take care of" his two friends in rooms 1500 and 2307. "This was agreed upon" and the officers followed the girls to room 1500 where Nancy was let in. Checchi then testified that he overheard a conversation between Nancy and the male occupant of room 1500 in which Nancy agreed to have sexual intercourse with the man at an agreed price provided he was able to perform the act; that they attempted the act, but it was not completed; and that following their attempt, Nancy said to the male: " 'Could you call Lori for me at EXbrook 7-0751?' " Checchi then overheard Nancy telling the party on the other end of the telephone " '. . . I am all finished and I am leaving now. I am coming right back.' " As Nancy left the apartment, Checchi placed her under arrest. Checchi testified that upon being questioned Nancy told him that the number she had called belonged to Lori Schultz at 1090 Montgomery Street, Apartment 103. Checchi then stated that this Lori Schultz had been under investigation since 1962 for prostitution activities.

Approximately an hour and a half after receiving the information from Nancy, Checchi and White went to defendant's apartment. When Checchi told defendant that he "wanted to talk to her about an arrest of a sixteen-year old girl made this evening which implicated her," defendant started to slam the door. Checchi then pushed the door open and placed defendant under arrest. In the search of defendant's apartment immediately following her arrest, Checchi found a telephone with the number EXbrook 7-0751; an indexed address wheel and a white address book, which are the type of records customarily found in a call girl operation; and a scratch pad with the notation: " '12 Midnight. Mr. X, (room) 2307. Mr. Y, 1500.' "[4] Checchi also testified that his investigation revealed that persons named Mr. X and Mr. Y were registered at the Fairmont Hotel as occupants of rooms 2307 and 2202, respectively, on the night of July 30, 1964. In addition, Checchi found a two-piece lavender suit hanging in defendant's closet, which fit the description of the suit which Nancy had told Checchi defendant had purchased for her. Checchi testified, with respect to this suit, that Nancy told him it was located in defendant's closet and was being kept there until Nancy could pay for it through her earnings.

Defendant moved to suppress the admission of the afore-

---

[4] We have substituted fictitious names for the names actually appearing on said pad.

mentioned articles found in defendant's apartment at the time of her arrest, namely, the address wheel, address book, scratch pad and lavender suit, and also to strike Checchi's testimony concerning these exhibits, on the ground that they were seized as a result of an illegal search. The motions were denied and the articles were admitted into evidence.

In considering the propriety of the trial court's ruling upholding the arrest of defendant and the incident search and seizure, we note that a police officer may make an arrest without a warrant and conduct an incidental search where he has reasonable cause to believe that the accused has committed a felony. (§ 836; *People* v. *Torres,* 56 Cal.2d 864, 866 [17 Cal.Rptr. 495, 366 P.2d 823]; *People* v. *Cedeno,* 218 Cal.App.2d 213, 218 [32 Cal.Rptr. 246].) Reasonable or probable cause is shown if a man of ordinary care and prudence would be led to believe and conscientiously entertain an honest and strong suspicion that the accused is guilty. (*People* v. *Torres, supra,* p. 866; *People* v. *Cedeno, supra,* p. 219.) Such reasonable cause to justify an arrest and search may be derived from the personal observations of the arresting officer or from information supplied by a reliable informant. (*People* v. *Prewitt,* 52 Cal.2d 330, 337 [341 P.2d 1]; *Willson* v. *Superior Court,* 46 Cal.2d 291, 294-295 [294 P.2d 36]; *People* v. *Cedeno, supra,* p. 219.) Concerning the reliability of a particular informant, it is well established that where reliability cannot be predicated upon the police officer's previous acquaintance and dealings with the informant, it can nevertheless be established by the proven accuracy of the information given by the informant. Such substantiation may be supplied by corroborative facts known or discovered by the police officer. (*People* v. *Cedeno, supra,* p. 220; *People* v. *Bates,* 163 Cal.App.2d 847, 852 [330 P.2d 102]; *People* v. *Prewitt, supra,* p. 337; *Willson* v. *Superior Court, supra,* p. 295.)

Applying these principles to the case at bench, we have concluded that Checchi had probable cause to arrest defendant for a suspected violation of section 266i. Although Nancy was not a reliable informant, the information that the person she had called from room 1500 was Lori Schultz at 1090 Montgomery Street, Apartment 103, when corroborated by the facts already known and discovered by Checchi, was sufficient to cause him to reasonably believe that defendant had committed the felony of pandering. These corroborative facts consisted of Checchi's prior knowledge that a person whom he knew as Lori Schultz had been under investigation

for prostitutional activities since 1962; his overhearing Nancy agreeing to perform an act of prostitution with the male occupant of room 1500; his overhearing Nancy asking said occupant if he would call " 'Lori' " for her at EXbrook 7-0751; and his overhearing Nancy stating to the party at the other end of the telephone that she was finished and was leaving and " 'coming right back.' " Accordingly, since the arrest was lawful, a search incident to such arrest, even though without a search warrant, was proper. (*People* v. *Torres, supra,* p. 866; *People* v. *Cedeno, supra,* p. 218.)

### The Sufficiency of the Evidence to Support the Verdict of Guilty to the Pandering Charge

Defendant next contends that the evidence was insufficient to support a finding of guilty to the pandering charge[5] as alleged in count two of the indictment. In this respect defendant argues that although the evidence may show that defendant procured the prosecuting witness to engage in prostitution, there was no evidence that defendant procured for the witness a place as an inmate in a house of prostitution. Section 266i in relevant part defines a panderer as "Any person who . . . (c) procures for a female person a place as inmate in a house of prostitution or as an inmate of any place in which prostitution is encouraged or allowed within this State; . . ."[6] The evidence before the trial court in the instant case consisted of the above-discussed testimony of Checchi and of the exhibits which were seized from defendant's apartment at the time of her arrest. In addition, it was stipulated that defendant had referred Nancy to a Dr. Yale Rosenfeld; that Dr. Rosenfeld had tested her for venereal disease; and that the " 'Wendy Johnson' " named in Dr. Rosenfeld's records was in fact this same Nancy.[7]

Turning to defendant's contention that the evidence was insufficient to support the trial court's finding that defendant was guilty of pandering, we first note several definitions

---

[5]Although defendant also raises the issue of the sufficiency of the evidence to support the pimping charge, we consider it pointless to discuss this issue since defendant was neither convicted nor sentenced for pimping.

[6]This is the charging language of count two of the indictment in the instant case.

[7]The prosecution called Nancy as a witness. She denied engaging in prostitution for or at the suggestion of defendant. Upon claiming surprise, the prosecution was permitted to attempt to impeach Nancy by her testimony before the grand jury wherein she had testified that she had agreed to work for defendant and to commit acts of prostitution for a "fifty-fifty split," and that she had in fact committed various

812

pertinent to the crime specified in section 266i: A "house of prostitution" is a house in which a prostitute plies her trade[8] (*People* v. *Mitchell,* 91 Cal.App.2d 214, 217 [205 P.2d 101]; *People* v. *Head,* 146 Cal.App.2d 744, 748 [304 P.2d 761]; *People* v. *Frey,* 228 Cal.App.2d 33, 52 [39 Cal.Rptr. 49]); a "prostitute" is a woman who offers herself indiscriminately for sexual intercourse for hire (*People* v. *Head, supra,* p. 748; *People* v. *Phillips,* 70 Cal.App.2d 449, 452 [160 P.2d 872]; *People* v. *Frey, supra,* p. 52); an "inmate" is a female who is induced or encouraged to occupy, live or abide in a house of prostitution (*People* v. *Benenato,* 77 Cal.App. 2d 350, 362 [175 P.2d 296]; *People* v. *Matsicura,* 19 Cal.App. 75, 78 [124 P. 882]); and the term "procure" means assisting, inducing, persuading or encouraging a female person to become an inmate of a house of prostitution (*People* v. *Montgomery,* 47 Cal.App.2d 1, 11-12 [117 P.2d 437]).

In construing the meaning of " 'house of prostitution' " in connection with section 266i, the reviewing courts have stated that "The statute encompasses any place where prostitution is encouraged or allowed. . . ." (*People* v. *Martin,* 228 Cal.App.2d 677, 680 [39 Cal.Rptr. 669]; *People* v. *Nasworthy,* 94 Cal.App.2d 85, 91 [210 P.2d 83].) Thus it has been held that a house of prostitution may be a taxicab (*People* v. *Nasworthy, supra,* p. 91); the customer's apartment (*People* v. *Courtney,* 176 Cal.App.2d 731, 739 [1 Cal. Rptr. 789]); the defendant's house or apartment (*People* v. *Courtney, supra,* p. 739; *People* v. *Head, supra,* p. 748); the prostitute's apartment (*People* v. *Martin, supra,* pp. 679, 681); a motel or hotel room (*People* v. *Vetri,* 178 Cal.App.2d 385, 390, 392 [2 Cal.Rptr. 795]; *People* v. *Frey, supra,* p. 53); or, as stated in *People* v. *Marron,* 140 Cal.App. 432, 435

---

acts of prostitution under this arrangement. Nancy repudiated her testimony before the grand jury, stating that the testimony she gave there was not the truth but was prompted by her desire to blame someone else for her predicament. At the conclusion of the trial, leave having been granted to reopen the People's case, Nancy recanted her previous testimony to the effect that she had not worked as a prostitute for defendant and testified that she did work for defendant as a prostitute in July of 1964 and that her testimony at the trial was prompted by her desire not to have "anything happen" to defendant. Upon the submission of the case the trial judge stated that in determining the issue of defendant's guilt he rejected all of Nancy's testimony because she had testified falsely.

[8]The authorities in this state consider the terms " 'house of prostitution' " and " 'house of ill-fame' " as being synonymous. (*People* v. *Frey,* 228 Cal.App.2d 33, 54 [39 Cal.Rptr. 49]; *People* v. *Courtney,* 176 Cal.App.2d 731, 739 [1 Cal.Rptr. 789].)

[35 P.2d 610], "a flat-boat with a cabin on it; a tent; one room of a steamship; or a single room; . . ." Accordingly, within the ambit of these definitions as applied to the instant case, it is apparent that both defendant's apartment and room 1500 of the Fairmont Hotel could be a "house of prostitution" within the meaning of the subject statute.

In *Martin,* the appellate court, noting that the legislative intent of the subject statute is "clearly to provide proscriptions against, and punishments for, those who would batten upon the weaknesses of others," and recognizing that it was not the intent of the statute to restrict the section to the old-fashioned houses of ill-fame of the "crib house" variety, stated as follows with respect to the activities of the modern "madam": "The fact that in this day of telephonic communications and rapid automotive travel the madam's 'parlour' may be her own apartment equipped with telephone and 'trick books,' and the 'cribs' of the mentally, morally or spiritually bankrupt girls from whose degradation she seeks to profit may be their private apartments spread throughout the city, renders her actions no less despicable or identifiable as pandering." (P. 681.)

█ Analyzing the present case in the light of the foregoing principles, we are satisfied that the evidence is sufficient to sustain defendant's conviction for the crime of pandering as defined in section 266i. We are satisfied, moreover, that the evidence is not only sufficient to establish that on the night in question room 1500 in the Fairmont Hotel constituted a house of prostitution and a place where prostitution was allowed,[9] and that Nancy was an inmate thereof as the result of the inducement, assistance and encouragement of defendant, but also sufficient to sustain a finding that defendant's apartment was a place where prostitution was encouraged and that Nancy was "procured" as an inmate thereof. This conclusion is warranted by the reasonable inferences which the trier of fact was entitled to draw from the following facts established by the evidence: the prostitution activity at the hotel on the part of Nancy and the occupant of room 1500; the telephone call which Nancy made from the hotel to " 'Lori' " at EXbrook 7-0751 and the former's statement that she was " 'finished' " and was

---

[9]It should be pointed out in fairness to the hotel management that this conclusion is predicated upon the use of the room by its occupants. As previously noted, moreover, Checchi was called to investigate the subject activities at the hotel upon the complaint and request of the hotel management.

" 'coming right back' ''; the statement by Nancy to Checchi that the number she had called belonged to Lori Schultz at apartment 103, 1090 Montgomery Street; Checchi's knowledge that Lori Schultz had been under investigation for prostitution activities since 1962; Checchi's verification upon entering defendant's apartment that the telephone there bore the exchange EXbrook 7-0751; the finding in the apartment of the suit which defendant had purchased for Nancy; the presence in the apartment of the indexed address wheel, white address book, and scratch pad; and finally, the evidence that defendant had referred Nancy to a doctor to be tested for venereal disease.

In relation to the scratch pad upon which was written " '12 Midnight. Mr. X, (room) 2307. Mr. Y, 1500,' '' Checchi testified that he saw Nancy and the other girl at the Fairmont "Approximately just after midnight" and that his investigation on the night of the arrest disclosed that room 2307 was registered to Mr. X, room 1500 to Mr. Z,[10] and room 2202 to Mr. Y. As already indicated, Checchi testified that when he and his partner first followed Nancy and the other girl on the evening in question they overheard the two girls having a conversation with a male in room 2202 who told them to take care of his two friends in rooms 1500 and 2307. The effect and weight and the inferences to be drawn from this relevant evidence was for the trial judge's determination.

With respect to the indexed address wheel and the address book, it should be noted that Checchi testified as an expert witness as to his familiarity with the type of records kept in "a call girl operation" and stated that the address wheel and book in question are the type of records that are customarily found in a call girl operation.[11]

The judgment is affirmed.

Sullivan, P. J., and Sims, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied February 9, 1966.

---

[10] We have substituted a fictitious name for this man also.

[11] Checchi testified that in his opinion the "Roloflex wheel" contained " 'trick' '' names behind which was a code marking; that a " 'trick' '' name is the fictitious name given by a man who phones for a "prostitutional date"; and that such " 'trick' '' name is cross-indexed with the person's true name. Checchi also testified that the white address book listed the names of prostitutes and also the subject's name, his phone number, a code marking and the name of the girl he would "deal with" and "would have his relations with."