In re Estate of Madia.

[Cite as In re Estate of Madia, 6 Ohio Misc. 109.]

(No. 670743—Decided March 18, 1966.)

REMOVAL OF ADMINISTRATOR: Cuyahoga County Probate Court.

*Mr. Russell Z. Baron,* for exceptor Clay.
*Mr. Donald J. Kennedy,* for exceptor Burns.
*Messrs. Mancino, Mancino & Mancino,* for administrator.

BARTUNEK, J. This matter comes before the court on a motion to vacate the granting of letters of adminstration, a motion to remove the administrator, and two exceptions to the inventory and appraisement of the estate. The purpose of all these pleadings is to challenge the contention of Don Madia

that he is the surviving spouse of Edythe Madia or Edythe Sheridan and thus entitled to be the administrator of her estate and the sole heir-at-law to her property.

Since there was no evidence of a ceremonial marriage, the issue to be determined in this case is, did the relationship between Edythe Sheridan Madia and Don Madia establish a common-law marriage?

The evidence in this case fairly discloses the following:

After 43 years of married life, Edythe Sheridan's first husband, Thomas, died on January 3, 1961, at their retirement home in California. Edythe brought her husband's body back to Cleveland for burial, and resumed an acquaintance with Don Madia whom she had not seen for three years.

This friendship ripened into a closer relationship and on or about May 2, 1961, Edythe came to live in the house at 9407 Denison Avenue in Cleveland, owned and occupied by Don Madia and his 83 year old mother, Agnes Madia. The property was a double house with Don Madia and his mother occupying the downstairs suite. It was unclear, as of May, 1961, who was occupying the upstairs suite.

Later on, in the middle of May, 1961, according to the testimony of Don Madia, Don and Edythe entered into a contract of marriage wherein they agreed to live together and to assume the relationship of husband and wife. Both were in their late fifties at this time.

During 1961, Don Madia introduced Edythe to his mother, his sisters, his niece, his attorney, his neighbors, and his insurance man as his wife. Edythe lived with Don and his mother in the Denison Avenue house.

In September, 1961, Don and Edythe flew to California where they were met by Don's brother, Frank, who had previously known Edythe and her first husband, Tom. Don introduced Edythe as his wife to Frank, who took them to the Sheridan house where they, Edythe and Don, occupied together one bedroom of the two bedroom house with Edythe's aunt occupying the other bedroom. Edythe introduced Don to her aunt as her husband.

Don stayed in California for two weeks doing repairs around the house and then returned to Cleveland. Later, in October, 1961, Edythe, still in California while Don was in

Cleveland, added Don's name to her California bank accounts. And Edythe remained in California until May, 1962.

In May, 1962, Edythe returned to the Denison Avenue house, which, at that time, was occupied by a tenant in the upstairs suite. This tenant continued to occupy the suite until July, 1962, and was then followed by another tenant who lived in the upstairs suite from November, 1962 to April, 1963.

In August, 1962, Don and Edythe returned to California together where they again stayed with Edythe's aunt in Edythe's house. During this trip, they stayed thirty days during which time Don replaced the garage roof. They tried to return to Ohio in Edythe's car, but it broke down, and Don and Edythe were forced to return by bus. Edythe again took up her residence at the Denison Avenue address.

In December, 1962, after Edythe purchased a new car, Edythe and a friend, Mildred Brokaw, drove to California. Mildred stayed with Edythe two weeks and then returned to Cleveland. Edythe stayed in California until July, 1963.

During 1962, Don introduced Edythe to his co-workers as his wife and she frequently made lunch for Don's work crew when they were in the vicinity of the Denison Avenue house. During this year, too, Don and Edythe visited together the niece and the aunt who are the exceptors in this matter, as well as other members of her family, but there was no evidence that Don or Edythe stated to her relatives that they were husband and wife.

In April, 1963, the upstairs of the Denison Avenue house became vacant and in May, Don joined Edythe in California and they returned to Cleveland in July. Shortly thereafter, the gas service in the upstairs suite was instituted in the name of Edythe Sheridan. Don, however, claims that he and Edythe stayed upstairs together during this period, which extended to October, 1964, but that they took their meals downstairs with Don's mother, and that they continued to live together as husband and wife. No telephone was ever installed in Edythe's name during this or any other period of time and when friends or relatives of Edythe wanted to telephone her they called her at Don't telephone number downstairs.

During 1963, Don and Edythe visited Edythe's relatives. Other neighbors met Edythe as Don's wife. During this year,

Edythe's house in California, the reason for her several trips to that state, was sold.

In May, 1964, one of the exceptors visited Edythe at the Denison Avenue house and testified that Edythe told her at that time that she would not marry Don. Also in 1964, Edythe and Don visited together other relatives and friends of Edythe, and, in June, 1964, Don and Edythe went to Hot Springs, Arkansas, to take the mineral baths.

En route there and back, Don and Edythe registered as man and wife in several motels and stayed at an apartment house in Hot Springs where Edythe had stayed before with her first husband, Tom. Edythe introduced Don to the manager of the apartment house as her new husband and they went out socially with him.

In October, 1964, the gas service to Edythe Sheridan in the upstairs suite was terminated and electrical service to a new tenant was instituted. Edythe, however, continued to live at the Denison Avenue house.

In January, 1965, Edythe became ill and was taken to the hospital where she remained for two weeks and returned to one of the downstairs bedrooms in the Denison Avenue house. In the early morning hours of February 27, 1965, Edythe again became ill and was readmitted to the hospital. She subsequently died on March 7, 1965, and she died without a will.

After her death, Don arranged for her funeral for which he was personally billed. Don, along with one of the exceptors, refused the hospital officials the authority to perform an autopsy.

At the funeral home, relatives of the exceptors testified that Don told everyone how tragic Edythe's death was and how Don and Edythe had had their blood tests so that they could get married.

Throughout her life with Don Madia, Edythe maintained her driver's license, her dog's registration, and other personal papers in the name of Edythe Sheridan. She was registered at the hospital as Edythe Sheridan, widow, and was so designated on her death certificate.

At the funeral home, she was listed as Edythe Sheridan, the obituary and the rememberance pamphlet referred to her as

Edythe Sheridan, widow of Thomas Sheridan, and she was buried in the cemetery plot next to her first husband as Edythe Sheridan.

Likewise, throughout his association with her, Don Madia maintained and filed his income tax records as Don Madia, the "unmarried head of household" and "single," did not list Edythe Sheridan as a dependent and maintained savings and checking accounts with Edythe, jointly as Edythe Sheridan and Don Madia.

Conflicting testimony was given as to the exact date of the alleged marriage as well as the statements about marriage made by Don Madia after Edythe died. Friends and relatives and neighbors of Don Madia testified forthrightly that there was a marriage between these two people, while relatives and friends of the exceptors testified equally forthrightly there was no marriage at all. What then was the relationship between Don and Edythe?

This court has previously held, that if the parties are competent to marry, all that is required to establish a common-law marriage is proof of a contract to marry *per verba praesenti. In re Estate of Soeder*, 4 Ohio Misc. 96. This proof, however, must be by clear and convincing evidence. *In re Estate of McLaughlin*, 93 Ohio Law Abs. 228; *In re Estate of Maynard*, 117 Ohio App. 315; *Cross* v. *Ledford*, 161 Ohio St. 469; and *In re Estate of Redman*, 135 Ohio St. 554.

In this case, the sole evidence of the contract of marriage comes from the person claiming to be the husband and therefore we cannot accept his unsupported statement as being of the weight required of clear and convincing evidence. Thus, we must look further to the law to see what are the other elements of a common-law marriage.

One of the earliest Ohio decisions on common-law marriage was *Carmichael* v. *State*, 12 Ohio St. 553, an 1861 case, wherein it was held:

"* * * that it was to be inferred from the statement that the parties openly and mutually consented to a contract of present marriage * * * then to become husband and wife, and thereafter cohabited as such, and that this constituted a legal marriage * * *"

This case introduced the thought in Ohio law that cohabitation and reputation were necessary elements additional to the contract to establish common-law marriage.

*Umbenhower* v. *Labus*, 85 Ohio St. 238, in 1912, adopted this same thesis, as did *Lumas* v. *Lumas*, 26 Ohio App. 502, in 1927.

In 1944, however, *Markley* v. *Hudson*, 143 Ohio St. 163, defined the real meaning of the previous decisions, where it held:

"An agreement to marry *in praesenti*, made by parties competent to contract, accompanied and followed by cohabitation, as husband and wife, with the result that they are treated and reputed as husband and wife in the community in which they reside, constitutes a common-law marriage.

"While such agreement to marry *in praesenti* must be proved by clear and convincing evidence, it may be established by proof of the acts, declarations and conduct of the parties and their recognized status in the community in which they reside."

This decision clearly indicated that when an agreement to marry *in praesenti* could not be proved by clear and convincing evidence, it could be established by evidence of the acts, declarations, and conduct of the parties. In other words, the cohabitation, reputation, and representation of the common-law marriage partners were found to be not additional elements necessary to prove a common-law marriage after the marriage contract had been proved, but rather supplemental elements used to prove the existence of the common-law marriage contract itself.

Further amplifying this thought, where there is a lack of clear and convincing evidence to prove the contract of marriage, in 1949, *Gatterdam* v. *Gatterdam*, 86 Ohio App. 29, held:

"In proving a common-law marriage it is not essential that there be proof of a holding out of the parties to such marriage as husband and wife in the community in which they reside, as long as there is proof of a holding out with those persons with whom the parties came in contact at the time of the marriage contract and of their living together as husband and wife."

And all of the above was well summed up in the 1952 decision of *Leibrock* v. *Leibrock*, 63 Ohio Law Abs. 565, which held:

"An agreement to marry can be reasonably inferred from

the acts and conduct of the parties in order to establish a common-law marriage.

"A mutual agreement of marriage *in praesenti* made by parties competent to contract, accompanied and followed by cohabitation as husband and wife, as a result of which the parties are treated and reputed as husband and wife in the community in which they reside, constitutes a common-law marriage.

"The agreement to marry *in praesenti* must be proved by clear and convincing evidence.

"Cohabitation and reputation are evidential facts from which the existence of a contract of marriage may be inferred.

"It is elementary that marriage rests on contract. * * *"

In the instant case, there was evidence of a contract to marry, but it could not be characterized as clear and convincing evidence. We must then look to the other elements of the relationship.

Was there a holding out as husband and wife? Testimony indicated that Don Madia introduced Edythe as his wife to his mother and brothers and sisters. Don's co-workers met Edythe as his wife and were entertained by her as a wife in her home. Don and Edythe registered at motels as husband and wife. And they lived as husband and wife in Edythe's house in California with her aunt.

Was there cohabitation? Certainly. Although the early status of Edythe at the house at 9407 Denison Avenue is not clear, it certainly appears that even during that first year (1961) Edythe and Don lived together in the same room in California. And, later on, it is clear, even from the evidence of the exceptors, that Don and Edythe lived together in the same downstairs bedroom in the Denison Avenue house.

Was there a reputation of marriage? Yes. The neighbors all considered Don and Edythe to be husband and wife, as did all the relatives and friends of Don Madia. The only persons who did not share this view were the exceptors and those immediatey related to them.

In short, all the elements are here to show, when a contract cannot be proven by clear and convincing evidence, that a common-law marriage existed.

What evidence is there to the contrary? The exceptors and their relatives said that Don and Edythe were not married to each other. But even these witnesses admitted that Edythe lived at 9407 Denison Avenue and that Don and Edythe visited them together.

Perhaps the most potentially damaging evidence to the common-law marriage contention is the fact that Edythe kept all her personal papers in the name she had borne for 43 years: Edythe Sheridan. Her dog's registration, driver's license, and bank accounts (although shared with Don) were all in her previous marriage name. And Don Madia did likewise. His income tax returns list him as unmarried as did other forms he filled out.

But what standing has this evidence in the face of the way that Edythe and Don lived? Are we to brand the gentle Edythe as a fornicator because she used one name instead of another? Are we to deny Don a share of Edythe's wordly possessions because he acceded to her wishes in this matter? Or are we to give recognition to the acts and deeds of these people as they lived together as man and wife.

The alleged statements made by Don Madia at the time of the death of Edythe in respect to the blood tests they had taken have no validity. There were no such blood tests. And the testimony of Edythe's relatives in this respect deserves little weight in comparison to the other evidence in this case.

And lastly, the only other evidence seeking to set aside the common-law marriage contract is the admission of Edythe as Edythe Sheridan to the hospital, the death notices, and the burial of Edythe as Edythe Sheridan. Again we come back to a name. What difference did it make?

It was Don who lived with Edythe in California and helped her sell her house and settle her accounts. It was Don who lived with Edythe in Ohio, entertaining their friends together, visiting their relatives together, and working together toward a better life. It was Don who was with Edythe in her hour of need to see that she got medical attention. And it was Don who lived with Edythe in sickness and in health, forsaking all others, until death did them part.

No, the use of a name, the anguish of a man who has just lost his loved one, nor the last resting place of a frail shell

of a human being cannot be used to set aside nearly four years of a loving life together as man and wife—a life that had much meaning and richness for Edythe and Don Madia.

It is our decision, therefore, that a common-law marriage has been established between Edythe Sheridan and Don Madia.

The motion to vacate the granting of letters of administration, the motion to remove the administrator, and the two exceptions to the inventory and appraisement of the estate are hereby denied.

*Motions and exceptions denied.*