Argued April 22, affirmed June 10, 1971

IN THE MATTER OF THE ESTATE OF R. L. STOUT, ALSO
KNOWN AS REYNOLD LEE STOUT, DECEASED.

BRIDGMAN, *Appellant, v.* STOUT, *Respondent.*

485 P2d 1101

*Melvin B. Goode,* Albany, argued the cause for appellant. On the brief were Goode, Goode, Decker & Hinson, and Raymond D. Matthies, Albany.

*George D. Leonard,* Portland, argued the cause for respondent. With him on the brief were Willner, Bennett & Leonard, Portland.

Before Schwab, Chief Judge, and Fort and Thornton, Judges.

FORT, J.

This case presents the problem of whether or not a common-law marriage was entered into in the state of Ohio between the plaintiff, Catherine H. Bridgman, and Reynold Lee Stout, now deceased. The trial court found against the plaintiff, and she appeals.

Plaintiff and Stout began living together as husband and wife in Oregon late in 1947 or early in 1948. At that time each was lawfully married to another. Plaintiff obtained a divorce from her prior husband in May 1948 and Stout was divorced by his wife in February 1949. Plaintiff's four children remained with her, while Stout's only child, Natalie, a defendant herein, remained with her mother. Plaintiff and Stout continued to live together for many years, holding themselves out as husband and wife. They filed joint income tax returns, acquired property as tenants by the entirety, and together operated a restaurant in Albany for a number of years. They continued living together as man and wife until Stout went to work in the Philippines in 1963.

Shortly after his return in 1964, Stout married, on June 16, one Jayne I. Quigley in Oregon, fathered a

child, who is a defendant herein, and obtained a divorce from Jayne in Oregon in September 1965. Thereafter he and plaintiff continued living together until 1966, when Stout returned to the Far East to go into business. On April 18, 1966, he married Rosario Quisol Ancajas in Rizal Province, The Philippines. They had one child, a daughter. She and her mother are defendants herein. Stout died in Quezon City, The Philippines, on March 27, 1969, leaving substantial assets. No issue was born to plaintiff and Stout.

■ Plaintiff concedes that she and Stout never went through a marriage ceremony. She contends, however, that late in 1952 in the state of Ohio she and Stout entered into a common-law marriage. If they did, it follows that Stout's two subsequent marriages were bigamous. Ohio, unlike Oregon,[1] recognizes common-law marriage. *Umbenhower v. Labus,* 85 Ohio St 238, 97 NE 832, 57 Weekly Law Bul 37, 90 Ohio Law Rep 554 (1912). It is elementary that a marriage valid in the state where it is entered into is valid in Oregon. *Walker v. Hildenbrand,* 243 Or 117, 410 P2d 244 (1966); *Boykin v. Industrial Accident Com.,* 224 Or 76, 81-82, 355 P2d 724 (1960); Restatement, Conflict of Laws § 121 (1934).

The plaintiff relies here on a period of time spent by her in 1952 with Stout in Ohio. Concerning this, she testified:

"Q What was the purpose of your trip to Ohio?
"A At that time Pete was laid off here in Al-

---

[1] "* * * In our opinion the doctrine of common-law marriage is contrary to public policy and public morals. It places a premium upon illicit cohabitation and offers encouragement to the harlot and the adventuress. We do not sanction loose marriages or easy divorces. * * *" Huard v. McTeigh, 113 Or 279, 295, 232 P 658, 39 ALR 528 (1925).

bany, he didn't have work, and he said, 'Well, why don't we go on back to Ohio and see what John is doing? Maybe I can work with John.' So my youngest daughter and Pete and I went back to Ohio and we went to Ruth and John's.

"Q And you lived there with them how long?

"A Oh, well, we went in around the first part of November and we stayed until around Christmas, around the second week in December. We were there for Thanksgiving because we had Thanksgiving dinner, I know.

"*    *    *    *    *

"Q Now, it didn't work out back in Ohio for him to get a job?

"A No, he just didn't seem to like it, and so we went on to see my folks, and from there we went to see his little girl *    *    *."

She did not take to Ohio her three older children, who remained here in Oregon.

On her cross-examination the evidence showed:

"Q And what was the purpose of this trip? A We went to see my mother-in-law and my brother-in-law, and we were there for a visit. We stayed over Thanksgiving up into November, on up into December. From there we went to Maryland to visit my father. Q How long did you stay there? A Well, we were there from the first of November until the first of December. *    *    *    Q Was that the principal purpose of the visit? A Yes. *    *    *

"*    *    *    *    *

"*    *    *    *    Q When you came to Ohio did you have any plans to stay for say a week, two weeks more or less, do you remember? A We were on vacation and we went back there to see his folks, and while he was there his brother needed help so we lived with his brother and helped his brother out. Q Is that one of the reasons you stayed longer? A Yes. *    *    *"

At the conclusion of the trip they returned to their home in Oregon, where they continued to reside.

■ In Ohio a common-law marriage must be established "by clear and convincing evidence."[2] Ross, *Ohio Law of Marriage,* 14 Western Reserve L Rev 724, 731 (1963), and cases there cited. *In re Estate of Redman,* infra; *Etter v. Von Aschen,* 82 Ohio L Abs 421, 163 NE2d 197, 11 Ohio Op 2d 195 (1959); *In re Estate of Madia,* 6 Ohio Misc 109, 215 NE2d 72, 35 Ohio Op 2d 234 (1966).

In *In re Estate of Redman,* 135 Ohio St 554, 21 NE2d 659, 14 Ohio Op 426 (1939), the Supreme Court of Ohio stated:

> "So-called common-law marriage contravenes public policy and should not be accorded any favor; indeed, it is quite generally condemned. It is well settled in Ohio that to establish a common-law marriage, all the essential elements of such a relationship must be shown by clear and convincing evidence. The statutes of Ohio contain definite regulations and requirements and prescribe rigid standards to which applicants for marriage license must conform. While these statutory provisions do not of themselves specifically prohibit marriage without the formalities enumerated by those provisions, such informal marriages are seldom recog-

---

[2] In Brastein v. Sedivy, 78 Ohio L Abs 481, 153 NE2d 541 (1957), a case holding a common-law marriage was not established, the probate court stated:

"Clear and convincing proof has been variously defined as that degree of proof, though not necessarily conclusive, which will produce in the mind of the Court a firm belief or conviction or, as that degree of proof which is more than a preponderance but less than beyond a reasonable doubt. Preponderance in turn, is not determined by the number of witnesses but by the weight of the evidence which weight is determined by the witnesses' opportunity for knowledge, the information actually possessed and related, and the manner in which the testimony is given." 78 Ohio L Abs at 482.

nized and are held valid by courts only to protect the rights of innocent persons. * * * [I]n such cases, the essential elements of such marriage must be established by the degree of proof stated."⑨ 135 Ohio St at 558-59.

The court also said:

"* * * The essential elements of a common-law marriage in this state were announced in the case of *Umbenhower v. Labus,* 85 Ohio St., 238, 97 N.E., 832. The following essential requirements for such a marriage are stated in the syllabus of that case:

" 'An agreement of marriage *in praesenti* when made by parties competent to contract, accompanied and followed by cohabitation as husband and wife, they being so treated and reputed in the community and circle in which they move, establishes a valid marriage at common law * * *.' " 135 Ohio St at 558.

■ Here the only evidence of an express contract to marry took place late in 1947 or early in 1948, when neither party had legal capacity to marry. Under the Ohio rule, such an agreement to be performed in the future does not meet the requirement of "an agreement of marriage *in praesenti.*"

In Ross, *Ohio Law of Marriage,* cited above, the author states:

"The second essential element of a common-law marriage is a contractual agreement to presently enter into the marital status. No particular form or wording is necessary. The contract need not be in writing, nor witnessed. The contract must be made

---

⑨ In Ross, *Ohio Law of Marriage,* 14 Western Reserve L Rev 724, 729 (1963), the author points out:

"The Ohio statute is unusual in one respect. Most states permit non-residents to marry in their state. In Ohio, however, the wife must be a resident of the state and of the county where she applies for the license, unless the husband is in the armed forces." See: Ohio Rev Code § 3101.05.

*per verba de praesenti, i.e.,* by words in the present tense. Dictum in some of the older cases indicated that mutual promises to marry in the future, followed by cohabitation, would constitute a valid marriage. This supposed rule has been expressly rejected in Ohio and apparently is not accepted in any state today." 14 Western Reserve L Rev at 731.

In *Walker v. Hildenbrand,* supra, the Oregon Supreme Court considered at length whether a series of visits to Idaho, a common-law marriage state, aggregating 20 days over a period of three years, by an unmarried Oregon couple who were living together here as husband and wife, was sufficient to create a valid common-law marriage. In holding that it did not, and after discussing cases from several jurisdictions, the court said:

"Generally, the cases rest on the proposition that the parties either were not residents or had not intended to create a common-law marriage in the state temporarily visited. Common sense would indicate that something as serious and vital to the welfare of society as a determination of the marriage relation should not rest on something as insubstantial as a holiday visit to a common-law marriage state with a person of the opposite sex during which the participants held themselves out as husband and wife. *This is particularly so where there is no evidence that the parties were aware that any change in their marital status would result or that the visit was made for the purpose of consummating a marriage.* Were the law otherwise, marriage might be an even more common event than is generally supposed. It can be argued that the law should be otherwise where the parties, both previously and subsequently, lived elsewhere in what purported to be the marriage relation. However, we do not believe a determining factor should be a temporary visit for holiday purposes to a common-law marriage state. For a contrary holding see *Estate of*

*McKanna*, 106 Cal App 2d 126, 234 P2d 673 (1951). The case of *Boltz v. Boltz*, 325 Mass 726, 92 NE2d 365 (1950), is also sometimes cited as a contrary holding but it should be distinguished on the ground that there was actual residence of short duration in the common-law marriage state." (Emphasis supplied.) 243 Or at 122-23.

Here, too, it is clear that "there is no evidence that the parties were aware that any change in their marital status would result or that the visit was made for the purpose of consummating a marriage."

■ We hold the plaintiff has not established by clear and convincing evidence and in compliance with the foregoing requirements that she and Stout entered into a valid common-law marriage in Ohio in 1952. The trial court, who saw and heard the plaintiff and the other witnesses, correctly so concluded.

The judgment is affirmed.